Filed 5/10/22  P. v. Garcia CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B304415 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA142806) |
| v. | |
| ANTONIO GARCIA et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick Connolly, Judge.  Remanded in part with instructions; affirmed in part.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant Antonio Garcia.

Jenny M. Brandt, under appointment by the Court of Appeal, for Defendant and Appellant Antonio Salgado.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, Marc A. Kohm and Julie Harris, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

In 1996, appellant Antonio Salgado shot a man at a Compton gas station at the behest of his coworker, appellant Antonio Garcia. The man survived the attempt on his life, and Garcia and Salgado avoided liability for the crime after another person was misidentified as, and convicted of being the shooter.

As part of a renewed investigation 20 years later, the wrongfully convicted man's brother, Miguel Contreras, surreptitiously recorded conversations with Garcia, Salgado, and a third coconspirator. Those primarily Spanish recordings and their English translations formed part of the evidence admitted at Garcia and Salgado's 2019 joint jury trial for attempted willful, deliberate, and premeditated murder, conspiracy to commit murder, and, as to Salgado only, felon in possession and firearm enhancements. The jury found appellants guilty as charged. The court sentenced Garcia to a total term of 25 years to life and Salgado to a total term of 60 years to life.

Appellants now raise numerous challenges to their convictions and sentences. Both appellants contend the trial court erroneously instructed the jury on the presumption of innocence during voir dire; improperly admitted the wiretap evidence, which they assert was not translated in accordance with constitutional and Evidence Code requirements and was hearsay to boot; and failed to stay their sentences for attempted murder under Penal Code section 654.[1] They further contend the evidence was insufficient to support their convictions absent the wiretap evidence, the prosecutor committed numerous instances

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

of misconduct during closing arguments, and their respective counsel were ineffective in failing to object to most of the errors they claim on appeal. Both appellants argue these errors, plus those they assert individually, collectively amount to prejudicial cumulative error. In supplemental briefing, appellants contend recent changes made to section 654 via Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1) require remand for resentencing.

Garcia alone challenges two jury instructions pertaining to his defense that he withdrew from the conspiracy: CALCRIM Nos. 401 (Aiding and Abetting: Intended Crimes) and 420 (Withdrawal from Conspiracy). Salgado alone contends the trial court erred by admitting into evidence a recording of Garcia's interrogation and denying his motion to strike the firearm enhancement and his prior strike conviction. Salgado further argues that his sentence is cruel and unusual punishment and violates the equal protection clause because he was excluded from youth offender parole due to his prior strike conviction. Salgado also filed a petition for writ of habeas corpus (Case No. B315109) in which he contends his trial counsel was ineffective for failing to raise objections at various junctures throughout the trial. We issued an order deferring consideration of the writ petition until such time as the related appeal was considered.

We agree with appellants and respondent Attorney General that the trial court erred in applying section 654, and the recent changes to section 654 are applicable to appellants. We accordingly vacate appellants' sentences and remand for resentencing in accordance with section 654. The judgments are affirmed in all other respects. Salgado's petition for writ of habeas corpus is denied by separate order.

## PROCEDURAL HISTORY

An information filed January 18, 2018 charged Garcia and Salgado in count one with attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664, subd. (a)), and in count two with conspiracy to commit murder (§§ 182, subd. (a)(1), 187). The information alleged a single overt act in furtherance of the conspiracy: "On or about September 10, 1996, Miguel Contreras and Antonio Salgado drove around Compton looking for Jose Garcia to kill him." The information further alleged that Salgado personally used a firearm in connection with counts one and two (§ 12022.5, subd. (a)(1)). It also charged Salgado in count three with illegal possession of a firearm by a felon (§ 12021, subd. (a)(1), and alleged that Salgado suffered a prior strike conviction (§§ 667, subds. (b)-(j), 1170.12) and a prior violent felony conviction (§ 667.5, subd. (a)).

Garcia and Salgado proceeded to a joint jury trial. The jury found both appellants guilty on counts one and two and found the firearm enhancement allegations against Salgado true. The jury also found Salgado guilty on count three. Salgado waived his right to a jury trial on the prior conviction allegations and admitted suffering the alleged conviction.

After finding that section 654 did not apply, the trial court sentenced Garcia to the mandatory sentence of 25 years to life on count two, the conspiracy count. It imposed a life term on count one, the attempted murder count, to be served concurrently with the sentence on count two. The trial court sentenced Salgado to the mandatory term of 25 years to life on the conspiracy count, but doubled the 25 years to 50 years due to Salgado's prior strike. It also imposed a consecutive term of 10 years due to the firearm

allegation, for a total sentence of 60 years to life on count two. On count one, the court imposed a life term, plus 10 years for the firearm enhancement, but stayed the 10 years and ran the life term concurrent with the sentence on count two. The court struck Salgado's strike for purposes of count two as well as count three, on which it imposed the high term of three years, also concurrent to the sentence on count two. The court imposed various fines, fees, and assessments on both appellants without objection.

Both appellants timely appealed. Salgado also filed a petition for writ of habeas corpus on September 20, 2021. We deferred consideration of the habeas petition to such time as we considered the related appeal.

## FACTUAL BACKGROUND

### *Prosecution Case*

### I.     The Shooting and Immediate Aftermath

#### A.     *Miguel's[2] Testimony*

Miguel testified that in 1996, he was 22 or 23 years old and worked with Garcia and Salgado in Compton. Miguel was "good friends" with Salgado, who was 21 at the time.

Sometime prior to the September 10, 1996 shooting, Salgado told Miguel that "Garcia was paying him money to whack this guy; in other words, shoot him or whatever, kill him." Salgado also told Miguel not to discuss the matter with Garcia. Miguel did not know the intended victim but as a "favor" drove Salgado around a couple of times so Salgado could look for him.

---

[2] We refer to Miguel Contreras and his brother Marco Contreras by their first names to avoid confusion. No disrespect is intended.

Miguel testified that September 10, 1996 was a "slow day" at work. Salgado told Miguel he was going to "stak[e] out" the victim; Miguel agreed to drive Salgado in Miguel's Bronco. They left work and drove to a location near the victim's house. Miguel knew where to go because Garcia "showed us the victim's house previous weeks before, or days before." Miguel knew that Salgado had a gun, which he had seen on multiple occasions.

While Miguel and Salgado were watching the house, the victim, Jose Manuel Garcia, got into a large commercial "box truck" and drove to a nearby gas station. Miguel drove to an alley near the gas station, dropped off Salgado, and waited in the Bronco. Miguel heard "maybe like five gunshots" before Salgado "ran back into the truck." Miguel then "took off" and drove to Salgado's sister's house to drop off the gun. Miguel later drove Salgado home, then dropped off the Bronco at his own home before going to his friend Ricardo Valencia's house. Miguel stayed at Valencia's house until his wife called to tell him the police were at their house picking up the Bronco.

Miguel returned home before going to the police station for questioning. He fabricated a story about visiting a friend who lived near the gas station at the time of the shooting. The subterfuge was unsuccessful; Miguel was arrested and charged in connection with the shooting.

Miguel's younger brother Marco attended Miguel's preliminary hearing on October 3, 1996. The parties stipulated that an eyewitness to the shooting identified Marco as the shooter at that hearing.

Miguel subsequently pled to accessory after the fact and was sentenced to 16 months in state prison. While he was incarcerated, he learned that Marco "was getting convicted for

6

this shooting." Miguel did not tell any prison guards Marco was innocent. But when Miguel was released from custody after serving approximately 11 months, he spoke to Compton Police Detective Reynolds, who had questioned him initially, and later spoke to someone at the Mexican consulate. "[N]othing really happened," and Marco remained incarcerated.

Miguel returned to work at the same company. Salgado still worked there. About three or four months later, Miguel's father and other brother came to the workplace and spoke to Salgado. Salgado immediately left work and never returned.

B. **Valencia's Testimony**

Ricardo Valencia testified[3] that in 1996, he worked for the same company as Miguel, Garcia, and Salgado, but at a different location. Valencia knew Salgado by the nickname "Dufus" and Garcia by the nickname "Chino."

At some point prior to September 10, 1996, Valencia became aware that his coworkers had a plan to murder someone. On one occasion Valencia accompanied Salgado and another individual known as "Munchy" as they drove around looking for the intended victim. While they were in the car, Salgado showed Valencia photographs of the victim's house and truck, which Salgado said Garcia had given him.

On September 10, 1996, Valencia went to work as usual. When he arrived home, Miguel's brother Marco was there. Marco

---

[3] Valencia initially was charged as a coconspirator alongside Garcia and Salgado, but took a plea deal pursuant to which he pled guilty to accessory after the fact and agreed to testify truthfully at the preliminary hearing and at trial. In exchange, he was released from custody. Defense counsel asked Valencia about the plea deal on cross-examination.

told Valencia "some stuff" that made him concerned. About a week later, Valencia spoke to Salgado about the shooting. Salgado told Valencia some details about the shooting. Valencia did not see Salgado again after that. Valencia also had conversations with other individuals about Garcia's involvement in the shooting.

### C. *Victim's Testimony*

Victim Jose Manuel Garcia[4] testified that on the morning of September 10, 1996, he drove his commercial truck to a gas station in Compton. While Victim was pumping gas, a "young man showed up." Victim testified the man was Hispanic and estimated his age to be "about 20."

The man asked Victim his name. Victim gave a false name because the situation felt "strange." The man then asked if Victim "had a job for him." Victim said he did if the man had a commercial driver's license and turned to put the gas cap back on his truck. He then saw the man draw a gun. Victim heard a gunshot and was struck by a bullet in the chest, near his heart. Victim heard "many" more gunshots as he ran away; one of them struck him in the back, just above his left buttock. Victim was unable to continue running and hid beneath a parked vehicle "to avoid the shots."

While Victim was beneath the vehicle, he saw the shooter run down the street. Victim got out and returned to the gas station; the attendant already had called 911. Paramedics arrived and transported Victim to the hospital, where he

---

[4] We refer to Jose Manuel Garcia as "Victim" to avoid confusion with appellant Garcia, with whom there is no relation. No disrespect is intended.

8

underwent three surgeries and remained an inpatient for over a month.

## II. Wiretaps

In 2015, Miguel contacted lawyers at Loyola Law School for assistance with Marco's case. He subsequently met with Detective Davey Jones from the Los Angeles County District Attorney's office, and Detective Ignacio Lugo from the Los Angeles County Sheriff's Department. Although the original case file and ballistics evidence had been destroyed, the case was reopened. Miguel agreed to surreptitiously record conversations with Garcia, Valencia, and Salgado.

### A. *Miguel & Garcia*

Miguel met Garcia at a Compton donut shop on January 12, 2017. Miguel wore a recording device and recorded their conversation. A portion of the conversation, which was largely in Spanish, was played for the jury and admitted into evidence; the jurors were given English transcripts, which also were admitted into evidence.

Miguel falsely told Garcia that Victim recently filed a lawsuit against the Contreras family and Miguel needed money to help with the lawsuit. Miguel referred to Salgado as "this guy, the one—the one who was paid to—to fuck him up"; Garcia said "aha," and, later asked, "How's the guy doing – oh the fool who got shot?" Garcia told Miguel, "let me talk to those fools to see what—what's up," and said he would "get back to" Miguel. After the men exchanged phone numbers, Garcia said, "I'll see what's up. I'm gonna talk to those fuckers."

### B. *Miguel & Valencia*

Miguel visited Valencia at Valencia's home on January 31, 2017 and surreptitiously recorded their conversation. A portion

9

of the conversation, which was largely in Spanish, was played for the jury and admitted into evidence while Valencia was on the stand; the jurors were given English transcripts, which also were admitted into evidence.

Miguel told Valencia he was lucky not to have been involved in "that shit." Valencia agreed, and said Munchy had been lucky too; he had driven around with Munchy to look for Victim. Valencia said, "Dufus had a photo of the house and the guy's truck, dude." Valencia continued, "And Chino took it, dude. . . . Chino says that supposedly the guy went to his house and Chino took a photo of the guy" as well as his truck. Valencia said, "I saw the pictures, fool." Valencia also said they located Victim's truck during the drive with Munchy, and reiterated, "Chino gave him everything, dude."

Valencia later said, "I remember when he shot him, he told me, dude. He says that the guy went under the truck and he still went like this, dude. . . ." Miguel replied, "Fucking Salgado, Dufus," and Valencia responded, "Yeah he says . . . when he first hit him, . . . he hit him in the . . . chest." Valencia continued, "He says that the guy fell and that he was yelling, 'No, please, son,' that he was telling him, man. . . . And Dufus would cry, dude. He says that he told him, 'He told me, "No, son, don't kill me, son."' . . . And he said he went under a truck or a van." Valencia added that Dufus said "he shot him to kill him so he wouldn't suffer anymore," but "regretted it" and "would cry at night, dude." Valencia further said that Dufus had asked the man if he had work before shooting him. He asked Miguel, "Did you hear the shots?" Miguel responded that he heard several shots after he dropped off Salgado in the alley.

Miguel later stated that Marco "was still there," and "that's something . . . fuckin' Salgado fucked up on. You know what I mean?" Valencia remarked that Marco was "going on twenty (20) years" and asked Miguel if he thought Marco would be released. Miguel mentioned parole, and Valencia said, "Yeah, I remember that it was in ninety-six (96), dude. I had just gotten in there, remember?" Valencia said he also had heard "that your dad and your brother fucked it up," but he thought they "shoulda just called the cops and tell 'em, 'Hey, this fools [*sic*] right here.'" After further discussion, Valencia asked, "Oh, you were out—you were outside when Dufus got away?" Miguel confirmed that he was out of custody at that point and continued talking about the conversation between his father and Dufus. Valencia said, "I don't blame Dufus for takin' off, man."

### C.   *Miguel & Salgado*

In February 2017, Miguel traveled to Missouri to speak to Salgado, who had relocated there after the confrontation with Miguel's father and brother. Miguel spoke with Salgado on February 21 and 22, 2017 and surreptitiously recorded the conversations. Portions of the lengthy conversations, which were largely in Spanish, were played for the jury and admitted into evidence; the jurors were given English transcripts, which also were admitted into evidence.

Miguel told Salgado the same story he had told Garcia: that Victim was suing his parents and Miguel wanted to see if Salgado could contribute financially. Miguel told Salgado, "[t]he old guy you shot" was "demanding" money for unpaid medical bills. Salgado did not deny shooting anyone. Instead, he asked Miguel what he thought "[o]f what we did." Miguel said, "we were kids and they're errors that one makes as a kid," then asked Salgado

11

how he felt about "all this." Salgado said, "I feel bad, man. . . . I never thought that your brother was going to get involved. I never thought you were going to get involved. I never thought I was going to go so far. For many years, I stayed outside. I stayed outside of California, not for fear of them knowing who I was, but out of respect for Marco[ ] and you. You and I were good friends. And, uh, we were idiots at the same time because we didn't know what we were doing. And we made that error, but again, I never thought that your brother would be involved or that I would go to such extremes." He added, "If I could take it back, I would. I really would. Don't think I've forgotten about your family. . . ." Salgado later asked Miguel "what[']d you do to that Bronco?" Miguel said he gave it away when he got out of prison.

Salgado offered to help with "whatever I can." Miguel responded that he had run into "Garcia" and tried to get help from him, too. Salgado responded, "Antonio?" Miguel confirmed it was Antonio Garcia, and said he had "told him . . . what I'm telling you," but had not heard anything back. Salgado said, "You know he's not going to help," and asked what Garcia had said. Miguel said that Garcia said he was "'going to tell those guys,'" and Salgado responded, "But I didn't meet any of them." Miguel said, "No?" and Salgado confirmed, "No, dude." Salgado later reiterated, "You're not going to get anything from him. I get to thinking, what he wants is for everything to be gone," or "to be left alone or whatever."

Miguel said he had told Garcia he would see if Salgado knew any of the "guys" Garcia mentioned. Salgado reiterated, "I just met him. . . . I never had anything to do with the rest of the people. Just him, and that was it. Never spoke to anybody else." Miguel responded, "Yeah, so I thought maybe they fronted you

some money or whatever . . . ." Salgado said, "the only thing they gave us was what we used to buy the. . . .," before trailing off. Miguel testified that Salgado had shaped his hand into a gun at that point, "meaning guns." Salgado then said, "I thought that he had given you something. He never gave you anything?" Miguel responded no, "because you had told me one time that you were going to tell me about what you were doing, but that Antonio Garcia didn't want me to know anything. And that's why I never said anything." Salgado responded, "I didn't ask for anything up front, but you can tell him if you see him again to give me some money." The following day, Miguel again raised the issue of whether others had been "involved with putting a hit on this guy." Salgado said he did not know: "even with Garcia man, . . . . [N]one of us know how deep he's in with whatever he's in or what he's doing or whatever."

At a different point in the conversation, Miguel told Salgado, "I wouldn't come all the way down here if you had nothing to do with it. It would've been none of your business." Salgado responded, "Yeah, no. I understand." Salgado also said he used to cry about "the things that I've done, your brother," and that it was "just tragic how the whole fucking thing happened. I always tell myself I wish I could take back what I've done." He said he felt "relieved" that he and Miguel had talked, "like I can move on." Separately, Salgado told Miguel he "wasn't hiding from you guys or from you, but honestly I was embarrassed," and felt it would "be disrespectful for me to go back" to California.

### III. Garcia's Interrogation

Detective Lugo testified that he interrogated Garcia on March 23, 2017. The 90- to 120-minute interrogation was conducted in Spanish and video recorded. Short portions of the

13

recording were played for the jury while Lugo was on the stand and later admitted into evidence. Partially redacted English transcripts were also admitted into evidence.

Lugo asked Garcia to "briefly tell me how things went down in '96." Lugo continued, "You [two redacted lines of text] and with Miguel Contreras . . . you were all working together . . . ." After a redacted exchange, Lugo said, "Him too, right? Okay." Lugo then confirmed that Garcia had said his cousin Javier Hernandez "was the one who talked to you about looking for someone to kill Jose—Manuel," because Victim was having relations with Hernandez's wife. Garcia further agreed that Hernandez offered to pay someone to kill Victim. Lugo asked if Garcia knew the amount offered, and Garcia replied, "Around 10,000 and something."

Lugo followed up with, "Around 10,000 and change? Around there? 10,000 dollars. And you said, and you can correct me if I'm wrong, but you were at [work] one day when you heard [redacted] chatting about whether he knew of a way to make some quick cash." Garcia said, "Yeah." Lugo continued, "And you told them, you mentioned to them that you knew someone who wanted to pay roughly 10,000 dollars to have [Victim] killed." Garcia again responded, "Yes." That portion of transcript concludes with Lugo stating, "And they offered to make the deal," followed by nearly a full page of redacted text. The video showed and Lugo testified that Garcia nodded in response to Lugo's query about making the deal.

A separate transcript from the end of the interrogation contained only the following exchange:

"Lugo: And you said, you told me, you told us that you went once—you got into the car with [redacted], and you went

14

and showed him the bar, the house, and the car belonging to [Victim].

"Garcia: Well, no, the vehicle was always driving around there.

"Lugo: Yes, but one thing—you told me that you once showed them where he lived on Coco and the bar where [Victim] liked to go.

"Garcia: Yes."

On cross-examination, Garcia's counsel asked Lugo if Garcia also told him "some information as it relates to telling the people not to get involved." Lugo said yes. Counsel continued, "And so he said - - he told them don't get involved; is that correct?" Lugo responded, "Not to do it." Counsel said, "Right," and Lugo said, "Yes." On redirect, the prosecutor asked Lugo, "what he actually told you was, however, the day of the shooting, on September 10th, 1996, that morning, he mentioned to the guys, hey, don't do it?" Lugo said that was correct. After refreshing his recollection with a transcript that was not introduced or admitted into evidence, Lugo testified that Garcia said he told "these individuals" "not to do it" once on the morning of the shooting, while they were at work.

## IV. Stipulations

The parties stipulated that Salgado had been convicted of a felony prior to the shooting. They also stipulated that an eyewitness to the shooting identified Marco as the shooter in court in 1996. That witness was shown three photo arrays in 2014; one contained a photo of Salgado, one contained a photo of Marco, and the third contained only decoy photos. The witness selected a photo from the array containing only decoy photos as the person who looked "closest" to the shooter.

***Defense Case***

Garcia called two of his adult daughters as witnesses. Silvia Lozano testified that Garcia was a "great" father and grandfather. He worked all the time when she was a child to provide for the family, which included Lozano, her three sisters, and a brother who was now deceased. She was not aware of any bad acts committed by Garcia. Lozano testified on cross-examination that she knew where Garcia worked in 1996 but did not know he had "asked two individuals whether or not they were willing to commit a murder" and "actually went with these individuals and showed them where this potential victim lived and where he hung out." Annette Garcia also testified that Garcia was a "great father" to her.

Salgado did not present any evidence.

## DISCUSSION

***Arguments Raised by Both Appellants***

## I. Presumption of Innocence

Appellants contend the trial court misinstructed the jury on the presumption of innocence during voir dire and failed to correct the error or otherwise ameliorate the harm via other instructions. They assert the error is structural and therefore prejudicial per se. Alternatively, they argue the error is prejudicial under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). Respondent asserts that any argument is forfeited, since neither appellant's trial counsel objected at any time. Anticipating the forfeiture argument, Garcia contends his trial counsel was ineffective for failing to object to the court's

statements; Salgado raises the same ineffective assistance argument in his habeas petition.

We agree with respondent that the issue is forfeited. Even if it were not, appellants have failed to demonstrate reversible error. Garcia likewise has failed to demonstrate his counsel provided ineffective assistance.

**A.** ***Background***

During voir dire, the court made the following statements about the presumption of innocence and burden of proof to the prospective jurors. We have italicized the primary portion to which appellants now object.

"All right. Now, as Mr. Salgado and Mr. Garcia sit here, they are presumed to be innocent. *And the only time that presumption changes is if you're chosen as one of the 12 people in this case, you've listened to all of the evidence in this case, you've listened to the attorneys argue the case, and I've given you the law on this case.* But throughout the entire trial, as I've stated, they are presumed innocent. What they've asked is for 12 people to come in, be fair and objective, listen to all of the evidence in this case, and make a determination as to whether or not they are guilty or not guilty.

"Now, if you were to be asked to vote right now if they are guilty or not guilty, first of all, everyone here agrees you have heard no evidence, whatsoever, that they've done anything wrong; you don't even know why they're here. Does everyone agree with that?

"(The prospective jurors responded.)

"All right. And if you were to be asked to vote right now, the only vote you could give is that they are not guilty. Everyone agree with that?

"(The prospective jurors responded.)

"And throughout this entire trial, if at any point in time you were asked to vote, the only vote you could give is that they are not guilty. Does everyone understand that?

"(The prospective jurors responded.)

"The only time – and I truly do mean this – the only time you're going to even be considering whether or not they're guilty or not guilty, is if you're in the back room, in deliberations, after doing everything I've already told you, listening to the evidence, the arguments and the law. Does everyone understand that?

"(The prospective jurors responded.)

. . . .

"Now, also with that, the defense in this case has no burden to prove anything to you. And that's the way it is in every criminal case. The defense has no burden at all. The burden is on the People to prove this case beyond a reasonable doubt.

. . . .

"So it really comes down to once you've heard the People's case, you still haven't made a decision. We're going to wait to see if the defense puts on any case. But it's only after all of the evidence is presented that you're going to make that decision.

"All right. Now, when I say that the People have the burden of proof, the burden of proof here is beyond a reasonable doubt. . . ."

Neither Garcia's nor Salgado's counsel objected to any of these remarks, immediately after which the trial court read CALCRIM No. 103 (Reasonable Doubt). That instruction states, in relevant part, "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you

18

the People must prove something, I mean they must prove it beyond a reasonable doubt, unless I specifically tell you otherwise.  [¶] Proof beyond a reasonable doubt leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proven their case beyond a reasonable doubt, you must impartially compare and consider all of the evidence that was received throughout the entire trial. Unless the evidence proves the defendants guilty beyond a reasonable doubt, they are entitled to an acquittal and you must find them not guilty." (CALCRIM No. 103.)

After the presentation of evidence, the court instructed the jury with CALCRIM No. 220 (Reasonable Doubt), which is identical to CALCRIM No. 103 (Reasonable Doubt).  During a break in the prosecutor's closing argument, the court sua sponte told the jury that it "must utilize the standard of reasonable doubt—not that you should, but you must"; the court said this was to clarify the prosecutor's assertion that the jury "should" apply that standard.  The court asked the jurors if they understood; the record suggests they responded favorably.

**B.**   *Analysis*

Appellants argue the trial court incorrectly stated that the presumption of innocence "changes" after the court delivers the final jury instructions and thus before deliberations begin.  As appellants correctly point out, the presumption of innocence continues throughout deliberations, until the jury reaches a verdict.  (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159 (*Cowan*); *People v. Arlington* (1900) 131 Cal. 231, 235.)

19

However, appellants forfeited the issue by failing to object below.  (See *People v. Monterroso* (2004) 34 Cal.4th 743, 759 [challenge to court's comments during voir dire forfeited by failure to object].)  Appellants cite section 1259[5] for the proposition that no objection is necessary to preserve a claim of erroneous jury instructions for review, but the court's comments during voir dire were not jury instructions.  A challenge to such comments constitutes a claim of judicial error subject to forfeiture.  (See *ibid.*; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1357 (*Seumanu*) [challenge to court's explanation of CALJIC No. 8.88 during voir dire was claim of judicial error requiring timely objection].)

Even if appellants had preserved their challenge to the court's comments, appellants would fail to establish reversible error.  A trial judge's erroneous comments during voir dire require reversal only if it is "reasonably possible" that the error affected the verdict.  (*Seumanu, supra*, 61 Cal.4th at p. 1358.)  "'[A]s a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case.  Any such errors or misconduct "prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings. . . .""'"  (*Ibid.*, quoting *People v. Medina* (1995) 11 Cal.4th 694, 741.)

We perceive no reasonable likelihood that the court's comment misled jurors to think that the presumption of innocence expired at the outset of deliberations.  Though the

---

[5] Section 1259 provides, in relevant part, "The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

court's statement that the presumption of innocence "changes" after the court instructs the jury was technically incorrect, the court made clear that the prosecution had the burden to prove appellants' guilt beyond a reasonable doubt, and the defense was not required to present evidence. Appellants omit from their briefing the court's back-and-forth with the prospective jurors, during which the court expressly clarified that the "only time" the jury was "going to even be considering whether or not they're guilty or not guilty," was during deliberations. The court formally instructed the jury on the presumption of innocence and the prosecution's burden of proof twice: during voir dire, with CALCRIM No. 103, and at the close of evidence, with CALCRIM No. 220. It also interjected during the prosecutor's argument to remind the jury that the reasonable doubt standard was mandatory. There is thus no reasonable possibility that the court's isolated and arguably ambiguous comment during voir dire affected the verdict. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1358 [where trial court informed potential jurors they would receive formal jury instructions if chosen to serve and later properly instructed the jury, any error in court's comments during voir dire was harmless].)

We would arrive at the same result even if we agreed with appellants' characterization of the comment as a jury instruction. Whether jury instructions correctly state the law is a question of law subject to de novo review. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "'When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an

impermissible manner.  [Citations.]'" (*People v. Jennings* (2010) 50 Cal.4th 616, 677; see also *People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.)  A single instruction may not be viewed in "'artificial isolation,'" but in the context of the entire record. (*People v. Mills* (2012) 55 Cal.4th 663, 677.)

As discussed above, it is not reasonably likely that the court's comment misled jurors to think that the presumption of innocence expired at the outset of deliberations.  Viewed in light of the other, indisputably accurate instructions, and the remainder of the record, the court's comment was not reasonably likely to lead the jury to jettison the presumption of innocence before deliberations.

Appellants' reliance on *Cowan, supra*, 8 Cal.App.5th 1152 does not convince us otherwise.  In *Cowan*, the prosecutor misstated the presumption of innocence during closing argument, telling the jury that the presumption was in place "only when the charges are read" and was "gone" thereafter.  (*Cowan, supra*, 8 Cal.App.5th at p. 1159.)  The court of appeal held that the remarks, which it called "completely wrong," constituted prejudicial misconduct that required reversal, as they directly contradicted the trial court's instructions and were "the last explanation about reasonable doubt the jury heard."  (*Id.* at pp. 1161, 1164.)  In contrast, in this case the trial court's single remark was far from the final word on the subject—the court engaged the prospective jurors in a colloquy about the presumption of innocence and instructed them using the pattern instructions multiple times.  The instant case is not "more extreme than . . . *Cowan*."  Nor is it analogous to the appellate case appellants assert is "controlling," *People v. T. Wah Hing* (1911) 15 Cal.App. 195, 198.  There the court erroneously told the

jury that those "entertaining" the opinion during deliberations that the defendant was guilty "should adhere to your opinion until you are convinced beyond a reasonable doubt that you are wrong." The isolated, ambiguous remark here was far less egregious. Appellants also argue that the prosecutor's closing argument, during which he told the jury there was no evidence that "points to innocence" and urged it to "reject the unreasonable and accept the reasonable," compounded the harm of the court's remark. We address appellants' extensive claims of (unobjected to) prosecutorial misconduct more fully below; for now, it is sufficient to say that these remarks were not misconduct and therefore did not prejudice appellants. Moreover, as Salgado points out in his reply brief when distinguishing another case, "[t]he court explicitly instructed jurors to follow the court's statements of law, not the attorneys."

### C.  *Ineffective Assistance of Counsel*[6]

To succeed on a claim of ineffective assistance of counsel, an appellant must make two showings:  (1) counsel's performance was deficient because it fell below an objective standard of reasonable competence; and (2) prejudice resulted. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 (*Strickland*); *In re Welch* (2015) 61 Cal.4th 489, 514 (*Welch*).)  "'Surmounting *Strickland*'s high bar is never an easy task.'  [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 105.)

To establish deficient performance, an appellant must demonstrate that his or her counsel's performance fell below an

---

[6] Appellants raise ineffective assistance of counsel claims in connection with many of their substantive arguments. We set forth the legal standards in full here and apply them throughout the remainder of this opinion.

objective level of reasonableness. (*Welch*, *supra*, 61 Cal.4th at p. 289.) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.) We presume counsel's performance fell within the wide range of professional competence and any actions and inactions can be explained as a matter of sound trial strategy. (*Ibid.*)

To establish prejudice, an appellant must demonstrate "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*In re Gay* (2020) 8 Cal.5th 1059, 1086.) "If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew* (2011) 52 Cal.4th 126, 150.)

Here, we found that any error in the court's remarks was harmless. Thus, Garcia is not able to establish a reasonable probability that the result of the proceeding would have been different absent the error. Even if a reasonably competent attorney would have objected, the lack of prejudice forecloses the ineffective assistance claim.

## II.  Admission of Translated Transcripts

Appellants contend the trial court violated their constitutional and statutory rights by admitting into evidence English transcripts of Garcia's interrogation and Miguel's conversations with appellants and Valencia. They argue the

24

translations were inadmissible because they were not prepared by a sworn translator, and appellants were denied the opportunity to cross-examine the person(s) who prepared the transcripts. Salgado properly preserved these arguments, but Garcia has forfeited them by failing to object below. We conclude that the court erred, but the error was harmless. We accordingly reject Garcia's claim of ineffective assistance.

### A. *Background*

At the outset of trial, Salgado's counsel objected to the introduction of "any transcript that's from Spanish to English [that] is not certified or was not transcribed by a certified Spanish translator." He stated it was his "understanding that any translation in court has to be done through a certified Spanish speaker. And, more importantly, any . . . audio recording has to be transcribed by a certified Spanish speaker. And to the extent that that work is farmed out to someone who is not certified, there would be an objection to that." He did not cite any authority for the objection aside from asserting that interpreters who interpret spoken language for defendants during court proceedings must have an oath on file; he said his objection was "under the same logic." Garcia's counsel did not join the objection. Neither defense counsel previously had objected to the prosecutor's representation at a pretrial hearing that he had provided defense counsel with translated transcripts, from "a Spanish language interpreter certified by the court."[7]

_____

[7] Appellants assert the trial court denied their motions for independent translators. No such motions are in the appellate record. However, the court stated on the record that defense counsel had in fact requested transcriptions of the recordings, not

25

The court overruled the objection. It stated that, to its knowledge, "as far as any transcript goes, a transcript does not need to be certified. Anyone can do their own transcript. I believe that's also the case with an interpretation or translation." The court added, "the defense always has the ability to take a look at any transcript, whether or not it's . . . translated . . . to say whether or not they agree with it or disagree with it. And so, as such, the defense has the opportunity to take a look and voice any objections to that transcript. If there is anything that they think is incorrect or erroneous, they can do that." The court offered to "take some time to do that." Both defense counsel said they had nothing further.

The court provided copies of the English transcripts to the jury and to Garcia's in-court interpreter while the Spanish recordings were played, and admitted the transcripts into evidence. At the close of evidence, it instructed the jury with CALCRIM No. 121 (Duty to Abide by Translation Provided in Court), which directed the jury to "rely on the transcript, even if you understand the language in the recording. Do not retranslate the recording for other jurors. If you believe the transcript is incorrect, let me know immediately by writing a note and giving it to the clerk. If the recording is partially in English, the English parts of the recording are the evidence."

Neither the parties nor any of the jurors apprised the court at any time that any portion of the translated transcripts was

independent translators, and "the court . . . held off on signing those orders, because the People had said they would be providing that." The court later added that both defense counsel had agreed they received the transcriptions. Neither counsel disputed the court's recollection.

inaccurate. However, the prosecutor pointed out inaccuracies in un-translated portions of the transcripts, reflecting parts of the recordings that were spoken in English. Salgado's counsel emphasized this concession during closing arguments, asserting, "The DA admits that there are errors in the transcript. . . . I don't know if there are errors in the translation, I don't speak Spanish fluently enough to do that . . . . But if some of the transcripts are in error, and then he says but use them anyway for a conviction, there's a question there." The prosecutor responded to this argument in rebuttal, asserting that defense counsel would have presented any errors had there been any.

B.    *Analysis*

Several sections of the Evidence Code govern interpreters and translators. Evidence Code section 750 states that "A person who serves as an interpreter or translator in any action is subject to all the rules relating to witnesses." Evidence Code section 751, subdivision (c) requires a translator to "take an oath that he or she will make a true translation in the English language of any writing he or she is to decipher or translate."[8] Evidence Code section 751, subdivision (b) states that translators or interpreters "regularly employed by the court, may file an oath as prescribed by this section with the clerk of the court. The filed oath shall serve for all subsequent court proceedings until the appointment

---

[8] "Audio recordings are writings as defined by the Evidence Code." (*People v. Dawkins* (2014) 230 Cal.App.4th 991, 1002.) Evidence Code section 250 defines the term "writing" broadly, to include all "means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored."

is revoked by the court." Evidence Code section 753 similarly provides that a translator must be sworn to translate a writing incapable of being understood directly, and "[t]he record shall identify the translator." (Evid. Code, § 753, subds. (a), (b).)[9]

In *People v. Torres* (1985) 164 Cal.App.3d 266 (*Torres*), the primary case upon which appellants rely, the trial court admitted over defense objection a translated transcript of a telephone call in which the defendant allegedly arranged a drug sale with an informant. (*Torres*, *supra*, 164 Cal.App.3d at p. 268.) There was no evidence the transcript was prepared by a certified court interpreter. (*Ibid.*) The defendant was found guilty of selling heroin. (*Ibid.*) On appeal, he argued that "absent the interpreter testifying under oath, as required by Evidence Code section 751, there lacked a meaningful opportunity to determine the qualifications of the interpreter, the accuracy of the transcript and an opportunity for cross-examination." (*Ibid.*) The appellate court agreed. It held that "Evidence Code sections 750 and 751 require the administration of a precisely formulated oath to any person who is to act as an interpreter, and the statutory requirements are mandatory in a criminal prosecution." (*Id.* at p. 269.) It further held that "[t]he failure to call the original translator to the witness stand denied the defendant a meaningful opportunity to cross-examine the individual who translated the material as to his qualifications and the accuracy of the translation. [Citation.] Therefore, the trial court erred in

---

[9] Though it is not cited by either party, California Rules of Court, Rule 3.1110(g) also provides that "Exhibits written in a foreign language must be accompanied by an English translation, certified under oath by a qualified interpreter." (Cal. Rules of Court, Rule 3.1110(g).)

admitting the transcript and denying defendant's objection." (*Ibid.*)

Appellants contend this case is on all fours with *Torres*. Respondent dismisses *Torres* as "vague" and analogizes the instant case to *People v. Roberts* (1984) 162 Cal.App.3d 350 (*Roberts*).  In *Roberts*, an interpreter translated for the prosecution's two main witnesses at the preliminary hearing.  By trial, one of those witnesses had left the country; the prosecution sought to have his preliminary hearing testimony read into evidence.  (*Roberts*, *supra*, 162 Cal.App.3d at p. 353.) The defendant objected on the ground that he was denied the opportunity to effectively cross-examine the witness at the preliminary hearing.  The defendant argued that that the interpreter was unqualified because his name was not on a list of recommended interpreters the court was required to use unless good cause dictated otherwise; he asserted no finding of good cause had been made.  (*Ibid.*)  The trial court overruled the objection and admitted the preliminary hearing testimony into evidence.  (*Ibid.*)  The appellate court affirmed. It held that the trial court's ruling "cannot be considered error because no evidence was introduced to support the allegation that [the interpreter] was unqualified to translate."  (*Ibid.*)  The court further noted an absence of evidence that the witness's testimony had been misinterpreted, the interpreter did not know what the witness was saying, or the witness's answers did not correspond to the questions being asked.  (*Ibid.*)

*Roberts* is inapposite.  The issue here—as in *Torres*—was whether the translator(s) had been certified and sworn as required by the Evidence Code and Rules of Court. Aside from the prosecutor's unchallenged oral representation that the

29

translations were prepared by certified interpreters, nothing in the record identifies the translators or shows the required oath was administered or was on file. This is error under the Evidence Code and Rules of Court. (See *Torres*, *supra*, 164 Cal.App.3d at p. 269.)

However, as respondent points out, appellants largely ignore the portion of *Torres* in which the error was found to be harmless beyond a reasonable doubt. In *Torres*, the court concluded the error was reversible only if prejudice was shown. (*Torres*, *supra*, 164 Cal.App.3d at p. 269.) It further determined "no prejudice or miscarriage of justice appears to have occurred," because the transcripts were authenticated by a witness who spoke fluent Spanish and was present during the conversations, and "[d]efense counsel had the opportunity to challenge the accuracy of the translations through [that witness] or obtain his own expert to translate the recording into the English language." (*Id.* at p. 270.)

Appellants contend they were prejudiced: "No one verified the accuracy of the entire translations of any one statement. The witnesses answered questions about the statements, implying the snippet played was accurate. Absent someone swearing that the translation was in fact accurate, though, there was nothing to stop the witnesses from lying or being mistaken about what the prosecutor purported the transcript said." Salgado further asserts that the transcripts of his statements were exceedingly prejudicial because they "were tantamount to a confession," and the prosecutor "attempted to shore up" weaknesses in the case by arguing that the transcripts supported Miguel's and Valencia's in-court testimony.

We are not persuaded.  At the pretrial hearing, appellants did not dispute the prosecutor's assertion that the transcripts were prepared by certified translators.  More importantly, appellants had and took advantage of the opportunity to cross-examine Miguel, Valencia, and Detective Lugo, all of whom spoke Spanish and were participants in the recorded conversations.  They also had the opportunity to challenge the accuracy of the translations through these witnesses, or to call additional witnesses, but failed to do so.  "Transcripts of admissible tape recordings are only prejudicial if it is shown they are so inaccurate that the jury might be misled into convicting an innocent [person]."  (*People v. Brown* (1990) 225 Cal.App.3d 585, 599.)  No such showing has been made here.  Any error was harmless beyond a reasonable doubt.  (*Chapman, supra*, 386 U.S. at p. 24.)  Garcia's claim of ineffective assistance accordingly is denied.

## III.   Admission of Wiretap Recordings

Appellants generally contend the court erred by admitting hearsay in the form of the wiretap recordings.  Their arguments diverge somewhat, however.  Garcia concedes the statements he made during his conversation with Miguel "were admissible as party admissions under Evidence Code section 1220."  He contends Miguel's conversations with Valencia and Salgado were inadmissible against him because he did not participate in the conversations and the statements were not otherwise admissible under the coconspirator exception to the hearsay rule.  Garcia also asserts that his counsel was ineffective to the extent any evidentiary objections have been forfeited.  Salgado makes no ineffective assistance claim, either in his appellate briefing or his habeas petition.  Though his argument heading refers to "wiretap

31

recordings" generally, Salgado argues only that Miguel's conversations with Valencia and Garcia were hearsay not subject to the coconspirator, party opponent, or statement against penal interest exceptions; he does not challenge the admission of his conversation with Miguel.

Respondent contends appellants forfeited their objections to the admission of the recordings. Respondent also argues the recordings were properly admitted, and, if they were not, any error was harmless.

We agree with respondent that appellants have forfeited their objections to the admission of the Miguel-Garcia and Miguel-Salgado recordings. To the extent their arguments regarding the Miguel-Valencia recordings were preserved, we find any error to be harmless. Garcia's claim of ineffective assistance accordingly is denied for failure to establish prejudice.

## A. *Background*

At the outset of trial, Salgado's counsel objected that the wiretap recordings "contain multiple levels of hearsay" and were inadmissible "to the extent that they're not adoptive admissions." The court did not rule on this generalized objection at the time; instead, it ordered the prosecutor to apprise defense counsel of the excerpts he intended to use, and advised defense counsel that it would consider more specific objections to those excerpts. Garcia's counsel did not join the objection.

While Valencia was on the stand, and the prosecutor was preparing to introduce the recording of his conversation with Miguel, Salgado's counsel made a "continuing objection based on hearsay and foundation to the contents of the conversation." Garcia's counsel joined the objection. The court acknowledged their objections to the entirety of the recording and transcript,

but stated that it "does not rely on continuing objections," which it overruled without further explanation. The court also told defense counsel, "if there's anything that comes up other than that, just make sure you object so it's clear on the record."

During further sidebar discussion of the Miguel-Valencia recordings, the prosecutor asserted that he was seeking to admit Valencia's statements about things Garcia said not for their truth but to contextualize Valencia's conversation with Miguel. The prosecutor pointed out that Garcia personally made similar statements during his interrogation that would be admissible. After further discussion, the prosecutor said he did not need to play the portions of the recording discussing Garcia's statements and could instead question Valencia about the shooting. At the request of Garcia's counsel, the prosecutor then proffered, "I want to ask [Valencia], was he aware that there was a contract for murder for hire for which anybody he knows was involved in, that he knows, because he was charged with a conspiracy. . . . And with that knowledge, did he ever go out with anybody, and who was that? And then lastly, play the second part of Mr. Salgado[, which is] an absolute admission by Mr. Salgado to this witness."[10] After even more discussion, the court asked the prosecutor if he was "good with directly asking him, did you know this?" The prosecutor said he was. The court said, "Okay. So I think we're going to cut that out." It added that it would allow the prosecutor to use leading questions with Valencia through "this area," and reminded defense counsel that they could object to specific questions.

---

[10] It appears the prosecutor was referring to the portions of the recording in which Valencia discussed conversations he had with Salgado, and statements Salgado made therein.

33

The prosecutor then asked the court to rule on whether Valencia could testify that Salgado told Valencia that Garcia was going to pay Salgado $10,000. Garcia's counsel objected on the grounds of foundation, double hearsay, and "lacks form." The court overruled the objection and said, "The statements of the co-conspirator are going to be allowed in. I am going to allow it in as to that limited area." Following discussion about Valencia's role in the conspiracy, the court stated, "as to the other statements, the court is going to allow that to come in." No one asked for clarification of this or any other aspect of the court's ruling.

Valencia subsequently provided the testimony summarized above: he became aware of a murder plot at work in 1996; he accompanied Salgado and "Munchy" while they drove around and searched for Victim using photographs provided by Garcia; about a week after the incident, Salgado told him details about the shooting; later, he talked with others about Garcia's involvement. No hearsay objections were raised to this testimony. The prosecutor then played the recordings for the jury, and the recordings and translated transcripts were admitted into evidence. No further hearsay objections were raised when the recording was played.

Though he does not challenge the admission of his own conversation with Miguel, Salgado points to several objections his trial counsel made to Miguel's testimony before the recordings were introduced or played. He does not identify any hearsay objections his trial counsel made to the recording of Miguel and Garcia, and Garcia does not identify any hearsay objections his trial counsel made to the recording of Miguel and Salgado. "'It is the duty of counsel to refer us to the portion of the record supporting [defendant's] contentions on appeal. [Citations.] . . .

34

"It is neither practical nor appropriate for us to comb the record on [defendant's] behalf."' [Citation.]" (*People v. Smith* (2015) 61 Cal.4th 18, 48.) We did not do so here.

At the close of evidence, the court instructed the jury with CALCRIM No. 305 (Multiple Defendants:  Limited Admissibility of Defendant's Statement).  That instruction directed the jury to consider Salgado's out-of-court statements against Salgado only, and to consider Garcia's out-of-court statements against Garcia only.

**B.** *Analysis*

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (Evid. Code, § 1200, subd. (a).) As a general rule, hearsay is inadmissible. (Evid. Code, § 1200, subd. (b).)  However, there are many exceptions to the general rule, including Evidence Code section 1220, which provides that hearsay statements are not inadmissible "when offered against the declarant in an action to which he is a party."  Evid. Code, § 1220.)  Another exception applies to statements made by a participant in a conspiracy to further that conspiracy, if the statement was made prior to or during the declarant's participation in the conspiracy and is offered either after admission of evidence sufficient to sustain those facts, or subject to the admission of such evidence.  (Evid. Code, § 1223.)

We review a trial court's ruling on the admissibility of evidence, including one that turns on the hearsay nature of the evidence, under the abuse of discretion standard.  (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)  Even if the trial court abused its discretion and admitted evidence erroneously, we do

not set aside the judgment unless "(a) There appears of record an objection to or a motion to exclude or strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and (b) [we are] of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.)

Here, appellants failed to make any sort of clear hearsay objection to the Miguel-Garcia and Miguel-Salgado recordings. Even their continuing objection, upon which the trial court said it "does not rely," explicitly referred only to "the contents of *the conversation*" being discussed at the time: the one between Miguel and Valencia. "[T]rial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 756.) Appellants' arguments concerning the admission of the Miguel-Garcia and Miguel-Salgado recordings accordingly are forfeited.

Appellants did object on hearsay grounds to the Miguel-Valencia statement. In response, the court and parties agreed that the prosecutor would question Valencia about a portion of the recording. Valencia then testified to the salient details of the conversation, including statements made by Salgado, a party opponent. Those statements were admissible against Salgado under Evidence Code section 1220. The court instructed the jury to consider these statements against Salgado only, and we presume the jury followed that instruction. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 26.)

This admissible testimony covers the same ground as the recording. Although it is less detailed, the salient facts are all

present: Valencia was aware of a murder plot; Valencia looked for Victim with Salgado, using photos provided by Garcia; and Salgado told Valencia details about the shooting sometime after it occurred. Given the admission of this testimony, any error in admitting the recording (and related transcript) was harmless. Garcia's ineffective assistance claim is denied as to this recording. We also conclude he has not demonstrated prejudice due to his counsel's failure to object to the Miguel-Salgado conversation; the jury was instructed to consider Salgado's statements only as to Salgado, and the other recordings involving Garcia strongly implicated him

## IV. Sufficiency of the Evidence

In his brief joining most of Salgado's arguments, Garcia contends for the first time that "the legally competent evidence admitted to prove Garcia's guilt was insufficient as a matter of law [to] prove the elements of the crimes beyond a reasonable doubt. The judgment must be reversed and retrial barred by the double jeopardy clause." He argues that the English transcripts of the Spanish recordings were "not legally competent evidence" because the court at one point stated that the recordings, not the transcripts, were the evidence. Therefore, the only "legally competent evidence of Garcia's guilt consisted of the testimony of Ricardo Valencia and Miguel Contreras, both of whom were accomplices for which there was insufficient corroboration." Salgado joins this argument, which he asserts applies equally to him, in a separately filed brief. [11] Respondent asserts that the

_____

[11] Both appellants acknowledge the untimely nature of the contention, but assert "the issue logically flows from the issues raised by Salgado's Opening Brief." They further express a

37

contention should be rejected on the merits and that appellants' interpretation of the double jeopardy rule is incorrect. We agree the argument lacks merit. We need not address the double jeopardy issue. To the extent Garcia's blanket assertion of ineffective assistance of counsel applies to this claim, it is denied.

### A. *Background*

Valencia was the first witness through whom the prosecutor sought to introduce the wiretap recordings. After the prosecutor marked the Miguel-Valencia recording and transcripts, the court told the jury that the prosecutor would be handing out copies of the transcripts. It continued, "The transcripts themselves are not evidence in this case, all right. What is actually on the recording, that is the evidence in this case." Salgado's counsel immediately lodged the previously discussed continuing objection to "the contents of the conversation"; neither he nor anyone else said anything about the court's comment. The court then paused distribution of the transcripts, excused the jury, and held the previously summarized sidebar discussion about the objections to the conversation and whether the prosecutor could get the information in through Valencia's testimony.

When the jury returned, the prosecutor resumed distribution of the transcripts. The court simultaneously told the jury: "And while those are being passed out, *I misspoke just a little bit*. Normally we have transcripts that are in English, so

---

willingness to file motions to file additional supplemental briefing "to the extent there is any issue about whether it can be argued in this joinder." Respondent does not address the potential forfeiture. We exercise our discretion to resolve the issue on the merits, primarily in the interest of judicial economy.

the transcripts themselves are not the evidence.  So in this case you're going to have both the Spanish and then the English translation, so you'll be following.  Some of this is in English; most of it looks like it is in Spanish.  So you're gonna have that, though, to follow through."  No one sought clarification of these remarks, which are not mentioned or cited in the appellate briefing.

At the close of evidence, the court instructed the jury with CALCRIM No. 121 (Duty to Abide by Translation Provided in Court).  As relevant here, that instruction stated:  "You heard a recording that is partially in a foreign language.  You received a transcript with an English language translation of that recording.  You must rely on the transcript, even if you understand the language in the recording.  Do not retranslate the recording for other jurors.  If you believe the transcript is incorrect, let me know immediately by writing a note and giving it to the clerk. If the recording is partially in English, the English parts of the recording are the evidence."  The prosecutor subsequently reminded the jury during closing that "whatever the Spanish translation is, you have to accept that. However, for the English, the evidence is the actual recording."

The court also instructed the jury with CALCRIM No. 335 (Accomplice Testimony: No Dispute Whether Witness is Accomplice), which provides that accomplice testimony alone is insufficient to convict a defendant and must be supported by other credible evidence. (See § 1111.)

### B. *Analysis*

In reviewing a challenge to the sufficiency of the evidence, we ask "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 (*Nguyen*), quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*Ibid.*)

In light of the court's initial comment that the recordings were the evidence, appellants contend the transcripts of the recordings were not evidence, let alone substantial evidence. Appellants correctly point out that the court initially misspoke and stated that the Spanish recordings, not the translated English transcripts, were the evidence. However, before the jury heard the recordings or saw the transcripts, the court explicitly said it previously misspoke. We reiterate that none of the parties acknowledge this correction, which only could have been intended to rectify the earlier misstatement. To the extent the correction may have been unclear, the court resolved any ambiguity by instructing the jury with CALCRIM No. 121 that the translations were the evidence, and the prosecutor reiterated that point during his closing argument. We presume the jury followed the

40

court's instruction, which it had available in writing during deliberations.  (*People v. Lindberg*, *supra*, 45 Cal.4th at p. 26.)

Salgado acknowledges the formal jury instruction, but asserts that, "in the context of the previous instruction"—i.e., the original misstatement, not the unacknowledged correction—CALCRIM No. 121 "informed jurors that they were not to personally translate the audio.  If anything, then, it essentially barred jurors from considering the evidence provided to them: the recording." This argument, which is unsupported by citation to authority, lacks merit.

Appellants do not dispute that the recorded conversations corroborate the testimony of accomplices Miguel and Valencia, or contend that the recorded conversations are improper corroboration under section 1111.  Garcia acknowledges that "[t]he crucial evidence connecting Garcia to the attempted murder were the discussions in the audio files played for the jury."  Salgado likewise states, "The *only* evidence potentially corroborating the accomplice testimony connecting appellant to the crime was appellant's adoptive admissions in wiretap conversations."  Because the contents of those conversations were admitted into evidence as translated transcripts, the jury had sufficient evidence to corroborate the testimony of accomplices Miguel and Valencia.  It therefore had sufficient evidence to support Garcia's convictions.

## V.    **Prosecutorial Misconduct**

Although neither appellant raised any claim of prosecutorial misconduct below, they now contend the prosecutor "committed pervasive misconduct" that "violated a litany" of their constitutional rights.  They argue reversal is necessary because the misconduct prejudiced them; additionally, they contend

41

reversal is appropriate to address "institutional concerns" about prosecutorial misconduct, namely repeated instances of misconduct by this prosecutor.[12] (See *People v. Hill* (1998) 17 Cal.4th 800, 847-848 (*Hill*).) They further contend their trial counsel rendered ineffective assistance by sitting "idly by" throughout the prosecutor's closing and rebuttal arguments.

We agree with respondent that appellants have forfeited the issue due to their lack of objection below. "A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." (*People v. Thornton* (2007) 41 Cal.4th 391, 454.) Nevertheless, we address the merits in light of appellants' alternative contention that their counsel were ineffective. (See *People v. Azcona* (2020) 58 Cal.App.5th 504, 515; see also *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1525 [reviewing court may exercise discretion to review forfeited claim if it affects appellant's substantial rights].) Given the breadth of appellants' claims, we structure this section differently than the others. First, we set forth the overarching legal principles. Then we provide background and analysis on a claim-by-claim basis. We conclude that some errors occurred, but were neither individually nor collectively prejudicial. We likewise decline to find prejudice on an "institutional" basis. We accordingly conclude trial counsel was not ineffective.

---

[12] We granted Salgado's request for judicial notice of 10 unpublished opinions in which the same prosecutor was found to have committed misconduct, and one partial reporter's transcript of a trial involving the prosecutor. In only one of those cases was the error found to be prejudicial.

**A.**   *General Principles*

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument.  [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].'  [Citations.]  To establish such error, bad faith on the prosecutor's part is not required.  [Citation.] '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.' [Citation.]"  (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667 (*Centeno*).)

"When attacking the prosecutor's remarks to the jury," as appellants almost exclusively do here, "a defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.  [Citation.]' [Citations.]"  (*Centeno*, *supra*, 60 Cal.4th at p. 667.)  In other words, the defendant must show prejudice resulting from any error.

If a prosecutor's intemperate conduct is so egregious as to infect the trial with such a degree of unfairness that the resultant conviction is a denial of due process, the defendant's federal constitutional rights are violated.  (*People v. Panah* (2005)

43

35 Cal.4th 395, 462.) Misconduct that falls short of rendering the trial fundamentally unfair may nevertheless constitute misconduct under state law if it involves the use of reprehensible or deceptive methods to persuade the trial court or jury. (*Ibid.*)

## B. *Facts Not in Evidence*

### 1. Background

During closing argument, the prosecutor discussed the Contreras family's efforts to exonerate Marco. He stated, "Finally, in about 2014, I believe, is when they talk to people that seen [*sic*] the case. And that was some attorneys, people from the Loyola Law School, and then finally the District Attorney's Office Investigation Unit, they're like, well, let's investigate this; it's been some time, we've got to make sure. Because justice has to prevail. It does."

Later, the prosecutor attacked defense counsel's anticipated argument that Miguel was not credible because he lied to appellants and Valencia while recording conversations with them. He stated: "Can you imagine if Miguel Contreras walked in, Kansas City, Missouri, defendant Salgado opens his door and says, hey, what's going on? What are you doing here? Well, I'm here. The cops are outside, and I'm wearing a wire, a recording. Man, you know, what's up? . . . You did a shooting and my brother's in jail because of you. Right? [¶] Is that what - - what kind of investigation that would that be? Marco would still be in jail."

During Salgado's closing, defense counsel identified witnesses that the prosecution failed to call. In rebuttal, the prosecutor characterized this argument as "saying why didn't you make this trial three months instead of five or six days? Because that's what it would be. Can you imagine calling all those

44

witnesses to come up here?  Because there is nobody arguing that the shooting didn't occur.  That's what witnesses are going to say, a shooting occurred.  The paramedics are going to say I showed up, and somebody was shot. Officers are going to say I showed up, somebody was shot.  [¶] So if they want to call them, by all means, and they didn't, because the other witnesses were not relevant to this proceeding.  They weren't there during these conversations between the actual culprits."  The prosecutor also stated, "Did I need to re-interview [Valencia], after he made this whole statement?  No.  Absolutely not.  That's a waste of time." And, "What's Marco going to say?  He wasn't even there. Yeah, I was at home and the next thing you know I got arrested, and 20 years later I'm here now."

### 2.    Analysis

It is prosecutorial misconduct to misstate the evidence or go beyond the record.  (*People v. Fayed* (2020) 9 Cal.5th 147, 204 (*Fayed*).)  Likewise, it is misconduct for a prosecutor to suggest he or she has witnesses who would have testified to certain facts without calling those witnesses.  (*People v. Boyette* (2002) 29 Cal.4th 381, 452 (*Boyette*).)  However, prosecutors have wide latitude in commenting on the evidence, including the reasonable inferences and deductions that may be drawn.  The reasonableness of the inferences the prosecutor draws is for the jury to decide.  (*People v. Thornton, supra*, 41 Cal.4th at p. 454.)

The prosecutor's statements about the investigation were reasonable inferences from the evidence.  Of the statements claimed by appellants to refer to facts not in evidence, we find problematic only those regarding what uncalled witnesses would say, and that it would have been a "waste of time" for the prosecutor to call those witnesses.  These statements are similar

to those found improper in *Boyette*, *supra*, 29 Cal.4th at p. 452. There, the prosecutor "suggest[ed] in closing argument that she had evidence in her possession that supported her line of questioning, but simply chose not to present it in the interest of saving the jury time. Thus, she stated: 'I don't need [to] bring in those witnesses in order to ask a hypothetical [question] to that witness. And you notice I did not bring in those witnesses. Those pale in comparison to what you already have in front of you. You are not going to find the death penalty because of some assaults and batteries. *So I did not waste your time with that type of information.*' (Italics added.) Suggesting that she had witnesses who would have testified to certain facts when she did not call such witnesses is misconduct." (*Boyette*, *supra*, 29 Cal.4th at p. 452.)

However, as in *Boyette*, "the potential for prejudice exists," but "we find the potential was not realized." (*Boyette*, *supra*, 29 Cal.4th at p. 452.) The trial court instructed the jury to decide the facts "based only on the evidence that has been presented to you in this trial," and that nothing the attorneys said was evidence. Moreover, the evidence against appellants, including self-incriminating statements, was very strong. For these reasons, the error was harmless. (See *People v. Rivera* (2019) 7 Cal.5th 306, 335.)

### C. *Misstating Presumption of Innocence and Burden of Proof*

#### 1. Background

While referring to CALCRIM No. 224 (Circumstantial Evidence: Sufficiency of Evidence), the prosecutor stated: "the law says if you have two stories, okay - - and talking about circumstantial evidence - - if you have two stories and they are

46

both reasonable, you have to accept the story that points to innocence, you have to. However, if you have two stories and one is unreasonable, you have to reject it. That's what I mean when I say accept the reasonable and reject the unreasonable. That's what I'm talking about in that instruction, as it pertains to circumstantial evidence." As an example, he asked the jury, "does it sound reasonable that, hey, they were going to do that killing, but I told them to stop, but they went anyway? How does that make any sense? [¶] . . . [¶] It's unreasonable to believe that you do all these things, and the morning that these individuals are going to go do it, you say don't do it, and they go anyways? Well, why would they go, if they didn't think they were going to get paid? It doesn't make sense. Reject it."

In rebuttal, after reviewing the Miguel-Salgado conversation, the prosecutor told the jury, "The point of all this is that what evidence points to innocence? There is no evidence in any of the transcript [*sic*], in anything he says in the transcript that points to him not being the shooter, because if there was, it would have been pointed out. There is no evidence of it. Everything he's talking about, he's the shooter. There's nothing that points to anybody else doing this, except for him. Use your common sense, folks."

### 2. Analysis

"It is improper for the prosecutor to misstate the law generally, and in particular, to attempt to lower the burden of proof." (*People v. Williams* (2009) 170 Cal.App.4th 587, 635.) Appellants argue the prosecutor did that here, by implying the jury was required to convict appellants if it believed the only inferences pointing to innocence were unreasonable. They assert the prosecutor's argument was "exactly" like that found to be

47

misconduct in *People v. Ellison* (2011) 196 Cal.App.4th 1342 (*Ellison*). We disagree.

In *Ellison*, the prosecutor urged the jury to "look at whether or not it's reasonable or unreasonable for the defendant to be innocent," defined "beyond a reasonable doubt" as "[i]s it reasonable that the defendant's innocent," and told the jury to "look at what's reasonable and unreasonable, when you look at all the evidence." (*Ellison*, *supra*, 196 Cal.App.4th at pp. 1351-1352.) The appellate court held that the prosecutor "improperly attempted to lessen the People's burden of proof by arguing to the jury that the beyond-reasonable-doubt standard required the jury to determine whether defendant's innocence was reasonable." (*Id.* at p. 1352.) The cited remarks here do no such thing. The prosecutor explicitly referred to the instruction on inferences to be drawn from circumstantial evidence, and argued the jury should rely on that instruction to reject as unreasonable Garcia's claim of withdrawal from the conspiracy. The prosecutor told the jury to reject an unreasonable inference, not that the ultimate question was whether it was reasonable to believe that appellants were innocent. His assertion that no evidence in the wiretap transcripts "point[ed] to innocence" was a comment on the evidence he introduced, not a suggestion that appellants bore any burden to point to their own innocence. "It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory." (*Centeno*, *supra*, 60 Cal.4th at p. 672.)

Appellants also analogize the case to *Centeno*, *supra*, 60 Cal.4th 659. There, the court found the prosecutor's argument improper because it "strongly implied that the People's burden was met if its theory was 'reasonable' in light of the facts

48

supporting it." (*Centeno*, *supra*, 60 Cal.4th at p. 671)  The prosecutor told the jury it had to reject impossible and unreasonable inferences, and make a decision that 'has to be in the middle.  It has to be based on reason.'" (*Ibid*.)  The court concluded this and other similar remarks "left the jury with the impression that so long as her interpretation of the evidence was reasonable, the People had met their burden." (*Id*. at p. 672.)  Here, the prosecutor's arguments are not reasonably susceptible to this interpretation.

any event, as discussed above, the court instructed the jury on the presumption of innocence and reasonable doubt standard multiple times.  There is no reasonable likelihood the statements challenged here led the jury to apply an incorrect standard.

### D.    *Appeals to Passion and Prejudice*

Appellants identify numerous alleged appeals to passion and prejudice made in both closing and rebuttal.  We group and discuss them thematically.

#### 1.    Background
##### a.    *Self-Referencing*

"Yeah, that's an adoptive admission.  You'll get that in here. Because there are some things that you could admit without saying a word, right? . . . Just like when I was little. I used to jump the fence all the time in the backyard.  There was an apartment building behind us, and they had this really good orange tree.  And I would jump it, and I would eat the oranges.  And we weren't supposed to . . . and the[n] my mom got on us.  And then when she asked me, hey, did you take those oranges, I didn't say a word. But I didn't have to, because my brother was there and he's a little tattletail [*sic*] . . . .  And I didn't deny it.  The last thing I'm going to do is I'm already getting in trouble,

49

now I'm going to lie to my mom? My mom was crazy. She's old school. It wasn't time out. It was straight up whatever is around. Sometimes it was go out and get me my shoe, you know, the one with the high heal [*sic*]."

During rebuttal, which occurred on Valentine's Day, the prosecutor stated, "I was a little bit we[a]ry this morning. I specifically wore the red, thinking you all were going to be wearing red, but it looks like just a couple. Just don't focus on this bad tie."

### b.     *Personally Addressing Jurors*

"I'm not even going to waste your time, because you guys are ready to go. Some of you are mad dogging me, so I'm going to keep moving right now. [¶] . . . [¶] You guys are all smart. I don't know if you noticed, but I picked all of you - - or excuse me - - the People considered all of you because of your ability to use your common sense. When we're asking you questions, all of you were on top of it. [¶] . . . I think I kicked like one guy [during voir dire], and he was - -  I think he fell asleep, so I had to kick him. But you can all use your common sense."

"And you might say to yourself, well, what's this about? Juror No. 6 may be, like, this guy is talking too much. Juror No. 12 might say he's not talking enough. I don't know."

### c.     *References to Justice/Injustice*

"[Y]ou heard that a mistake was made back in 1996, and that that person was released already. . . . [J]ust keep it inside and don't use that to decide the facts in this case. Just use what you've heard here. [¶] Okay, unfortunately, because of what happened, . . . everybody thought the case was over. . . . [¶] If it wasn't for Marco Contreras's family continuing to try to be heard by somebody, then we're not here. But they did, and eventually

somebody heard, and eventually somebody did something about it. And now it's your opportunity to have final justice in this matter."

As previously summarized, the prosecutor asked the jury "what kind of investigation would that be," if Miguel had been truthful with Salgado. "Marco would still be in jail."

"I'm going to ask that after you hear all of the arguments, you go and you deliberate, but you find these two responsible for all the trouble they caused; all of it, since 1996."

"The last thing I'll say is . . . there's not a lot of people in this world who ever get into a position where they can really instill justice. There isn't, there really isn't. But you all were chosen, the 12 of you and the alternates, to sit and listen to the facts of this case, and you do have a chance to instill justice in this world, in this case, and to find the right person responsible for what happened in 1996, for that cowardly act, knowing that somebody is in jail for something he did. . . . [¶] . . . [¶] He knows that there was an injustice, that's why he stayed away, not because Compton is a terrible place. [¶] So this is your opportunity, and I'm asking you to hold him responsible and to find justice."

### d. *Inflammatory Remarks*

Salgado "tells Miguel Contreras in the recording, he says, well, it was either Kansas or Georgia, but I didn't go to Georgia, because there are too many blacks there, so I'm going to stay here." The prosecutor repeated this statement while summarizing the recording in rebuttal.

"Is Miguel Contreras a liar? Yeah, he lied. He absolutely lied. [¶] Can you imagine being - - well, I'm not going to ask you to imagine. But you have a 22 year old, I'm assuming he's

51

Latino, in Compton, in 1996. They tow his truck. They tell him to come to the station. Yeah, he's going to be scared. And he was scared. Not only that, but he knew what he did."

"As a side note, he [Salgado] was talking about it in front of the kids."

## 2. Analysis

"'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' [Citation.] '[I]t is improper for a prosecutor to appeal to the passion or prejudice of the jury.'" (*People v. Rivera, supra*, 7 Cal.5th at p. 337.) It is also improper for a prosecutor to present irrelevant information or employ inflammatory rhetoric, as doing so diverts the jury's attention from its task and invites it to act irrationally or subjectively. (*People v. Redd* (2010) 48 Cal.4th 691, 742.) We review the comments not in the isolated fashion in which they are presented here, but in the context of the argument as a whole. (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) In the context of the entire argument, the self-referencing statements were trivial and in no way prejudicial. A passing reference to one's own tie is not inflammatory. Nor are we persuaded by appellants' assertion that the prosecutor's example illustrating the adoptive admissions rule "could only elicit sympathy" because it invoked his "abusive childhood." The illustrative example's offhand mention of corporal punishment is in no way analogous to *People v. Zurinaga* (2007) 148 Cal.App.4th 1248, 1255-1259, in which the prosecutor structured a significant portion of closing argument around an analogy to the 9/11 terrorist attacks. The prosecutor's reference to an

52

excused voir dire member was not, as appellants assert, an improper quotation of juror statements.  In both cases they cite, *People v. Riggs* (2008) 44 Cal.4th 248, 324-326 and *People v. Freeman* (1994) 8 Cal.4th 450, 517, the prosecutor quoted during closing argument actual statements made by sitting jurors during voir dire.  Here, the prosecutor simply stated that an excused prospective juror had fallen asleep; as endorsed in *People v. Freeman, supra*, 8 Cal.4th at p. 517, he addressed the argument to the jury as a body.  We are also not persuaded that the references to "Juror No. 6" and "Juror No. 12" were improper appeals to those jurors.  In the context of even just the surrounding sentences, these references simply suggest that different jurors may have different interpretations of the argument.  The prosecutor did not address any jurors by name, a practice "condemned" by the only case appellants cite on this point, *People v. Wein* (1958) 50 Cal.2d 383, 395, overruled on other grounds by *People v. Daniels* (1969) 71 Cal.2d 1119, 1140. Even *Wein* recognized that "it does not follow that such conduct is necessarily prejudicial in any given case." (*People v. Wein, supra*, 50 Cal.2d at p. 395.)  Here, two mentions of juror numbers were of minimal consequence in the broader argument that was predominantly focused on the evidence and the law.

Appellants argue it was improper for the prosecutor to tell the jury to render a verdict to do justice.  It is not misconduct to remind the jury to do precisely what it is supposed to. Contrary to appellants' suggestion that the prosecutor used the wrongful conviction to "pull[ ] at the jurors' heartstrings," the prosecutor expressly told the jurors to keep any feelings about Marco's wrongful convictions "inside," and instead "[j]ust use what you've heard here" to decide the case.  Even in the context of a death

penalty case, "'[i]solated, brief references to retribution or community vengeance . . . , although potentially inflammatory, do not constitute misconduct so long as such arguments do not form the principal basis for advocating the imposition of the death penalty.'" (*People v. Wash* (1993) 6 Cal.4th 215, 262.) Here, the "principal basis" of the argument was that the evidence supported convicting appellants beyond a reasonable doubt.

We agree with appellants that the prosecutor's references to Salgado's racially motivated reason for moving to Missouri rather than Georgia were inflammatory and improper. Respondent contends the "point was not that [Salgado] was racist, but that the sum of the statement showed . . . consciousness of guilt, and that the frankness of appellant Salgado's statements showed his confession was credible and not the unreliable product of trickery." There were many other frank statements in the transcripts to which the prosecutor could have referred; selecting this one, twice, was improper. The prosecutor's speculation about Miguel's race or ethnicity and the role it may have played in his 1996 interaction with law enforcement was similarly improper. The same point, that Miguel lied to police out of fear, could have been made without reference to his apparent race or ethnicity. We are less convinced that the accurate remark that the Miguel-Salgado conversation took place in front of Salgado's children was inflammatory. The transcript of the conversation was in evidence, and the presence of the children explained why some parts of the conversation were in Spanish while others were in English.

However, to the extent the inflammatory remarks—or any of the others—appealed to the jury's passions or prejudices, the errors were not prejudicial. The evidence in the case was very

54

strong.  The remarks were scattered throughout lengthy closing and rebuttal arguments.  Both the prosecutor and the court instructed the jury to resolve the case based on the evidence, not based on any sympathies, biases, or prejudice.

### E. *Vouching*

#### 1. **Background**

Appellants identify multiple statements they contend constitute improper vouching by the prosecutor.  Near the beginning of closing argument, the prosecutor remarked, "I say the police blew it back in 1996."  Once during closing and three times during rebuttal, the prosecutor said he was not making up the facts or the law.  While telling the jury there was an actual instruction directing them to use their common sense, he said, "I'm not kidding."  While discussing a portion of the instruction on adoptive admissions, he gave an example and said, "It's a rule.  I'm not making this up."  Similarly, while walking through the elements of attempted murder, he stated, "[a]nd I'm not making it up."  Finally, while discussing the portion of the Miguel-Salgado conversation that made it clear the men were speaking in front of Salgado's children who did not speak Spanish, the prosecutor said, "I'm not making this up.  It's all in the transcript. That's why they were speaking Spanish."

In addition, while addressing the accuracy of the translated transcripts in rebuttal, the prosecutor said that Salgado's counsel "got up here and argued that it's unbelievable that an attorney wouldn't go over the file with the client, right, is what he said with Miguel Contreras.  Well, [counsel] is a skilled attorney.  So if there are errors in the transcript, they would have been presented.  [¶]  And I do speak - -  Spanish is my first language, and my English is rocky, but if there were errors, it would have

been presented." The prosecutor further characterized the evidence the jury had as "amazing. What you had is what, you know, most times evidence isn't available or where actual participants are in here telling you what happened."

### 2. Analysis

"'While a "prosecuting attorney has a wide range in which to state his views as to what the evidence shows and the conclusions to be drawn therefrom" [citation], and in his argument to the jury the prosecutor may comment upon the credibility of witnesses "in the light of all the evidence in the case" [citations], "[i]t is misconduct for a prosecuting attorney to express his personal belief as to the reliability of a witness."' [Citation.]" (*Rivera, supra,* 7 Cal.5th at p. 336.) Impermissible vouching may occur if the prosecutor personally assures a witness's veracity or suggests that information not in evidence supports his or her testimony. (*Ibid.*) A prosecutor's expression of his or her personal opinion about the evidence is misconduct whether the prosecutor aims to bolster his or her own case or to undermine that of the defendant. (*Ibid.*) Additionally, "a prosecutor's reference to his or her own experience, comparing a defendant's case negatively to others the prosecutor knows about or has tried, or is improper." (*People v. Huggins* (2006) 38 Cal.4th 175, 207.) So too is offering a personal opinion based solely on their experience or other extra-record facts. (*Ibid.*)

Appellants contend the prosecutor improperly vouched for the quality of the evidence, the credibility of a witness, and the accuracy of a transcript. We agree in part. The prosecutor's remark that the police "blew it" was not vouching. The jury heard evidence that Marco was wrongfully convicted of the shooting, and that it took Miguel and his family years to get the

case reopened.  That police ineptitude may have played a role was a reasonable inference the jury could draw from this evidence.  The prosecutor's repeated assurances that he was "not making this up" also were not vouching.  The jury had before it the evidence and instructions to which the prosecutor was referring.  The prosecutor was merely highlighting portions of the evidence and instructions he thought would be important for their deliberation; he did not misstate the law or suggest defense counsel had been making things up.

On the other hand, the prosecutor improperly vouched for the accuracy of the transcript, based on his own personal experience as a Spanish speaker.  "[P]rosecutors should not purport to rely on their outside experience or personal beliefs based on facts not in evidence when they argue to the jury." (*Medina, supra,* 11 Cal.4th at p. 758.)  The prosecutor erred in doing so here.  He also erred in characterizing the evidence in the case as "amazing," to the extent his comment rested on a comparison with other cases he was familiar with but the jury was not.  (*People v. Huggins*, *supra*, 38 Cal.4th at p. 207.)

However, we are not persuaded that these isolated remarks were prejudicial.  No evidence was presented that the translations were inaccurate, and the jury was instructed that the evidence was the text as it appeared in the transcripts.  The evidence against appellants, including the transcripts, also was strong; even appellants acknowledge "it is not unreasonable for jurors to have found the wiretap recordings in this case compelling."  There is no reasonable probability the prosecutor's limited vouching affected the outcome.

**F.** *Shifting the Burden of Proof and Commenting on Silence*

### 1. Background

During rebuttal, the prosecutor argued that the defense also had the power to call witnesses:

"In the law there's something called failure to call logical witnesses. What that means is that the People have the power of subpoena, we can subpoena people to come to court. But the People aren't the only people that have that power. The defense can also subpoena people, they can also subpoena documents, if they think that those will be beneficial to be presented. So they can call all the witnesses they want. If they wanted to call - - let me see, I wrote this down. If they wanted to call Marco Contreras, the mother of Marco Contreras, the witnesses at the crime scene in 1996, Detective Reynolds, the officers, the four officers, Credencio, Delwyn, the paramedics, the Mexican consulate, the public defender, the judge - - I was waiting for Stormy Daniels to be in there in some kind of way He wants me to call the witness who got it wrong in 1996? That's what he wants? Because he can do that himself. They can call all the witnesses. If they want to call Marco Contreras, they can call him. [¶] . . . Yeah, they can call all the witnesses they want. But what are the People going to call them for?"

In refuting the defense argument that Salgado moved to Missouri simply to get out of Compton, the prosecutor discussed the portion of the Miguel-Salgado conversation in which Salgado said his then-wife had returned to California. "Well, what would make you stay somewhere you don't know anybody? There is no evidence that he had a job, anything. You're just there. He's hiding out. He was a bit of a coward. He knew everything that

58

happened. He was a bit of a coward." At the conclusion of rebuttal, while urging the jury to "instill justice" as summarized above, he stated, "you do have a chance to instill justice in this world, in this case, and to find the right person responsible for what happened in 1996, for that cowardly act, knowing that somebody is in jail for something he did. He admits that throughout the whole recording."

### 2. Analysis

Misconduct occurs where a prosecutor's argument reasonably can be interpreted as suggesting that he or she does not have the burden of proving every element of the charged offenses beyond a reasonable doubt. (*Hill, supra,* 17 Cal.4th at p. 831.) However, "it is neither unusual nor improper to comment on the failure to call logical witnesses." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.) The prosecutor's argument that the defense could subpoena witnesses falls into the latter category. Salgado's counsel argued during closing that Salgado "deserves" for the prosecution to call more witnesses. As the prosecutor stated in the rebuttal comments above, Salgado's counsel suggested several such potential witnesses: Marco, Marco's mother, Detective Reynolds, and forensic specialists or eyewitnesses. The prosecutor's responsive rebuttal that the defense could call those witnesses did not shift the burden of proof to the defense. Indeed, appellants acknowledge that the prosecutor "correctly told jurors about the legal principle of the defense failing to call logical witnesses." They contend he "went beyond that," but the remarks identified here do not imply that appellants had the burden to produce evidence or prove their innocence. (*People v. Woods* (2006) 146 Cal.App.4th 106, 112.)

Appellants contend the prosecutor improperly commented on Salgado's exercise of his Fifth Amendment right to remain silent by referring to him as a "coward." A prosecutor is not permitted to remark upon a defendant's silence. (*Griffin v. California* (1965) 380 U.S. 609, 615.) In the context of this case there is no reasonable likelihood the jury understood the prosecutor's comments in this fashion. Salgado stated during his conversations with Miguel that he remained in Missouri for so many years because he was "embarrassed," while Miguel stated he thought Salgado left because he was "spooked." The suggestion that Salgado was "a bit of coward" is a reasonable inference from this evidence.

To the extent the comment about a "cowardly act, knowing that somebody is in jail for something he did," toes more closely to the line, the prosecutor tied it directly to the evidence by accurately stating that Salgado "admits that throughout the whole recording." Appellants analogize this to *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1521, 1527, in which the court found misconduct where the prosecutor stated several times that the defendant, who had been apprehended while hiding in a wheel well, was "'still in that wheel well in a very real sense, and this time he's hiding from all of you.'" The court found the "most reasonable interpretation of the comment is that defendant was 'hiding' from the jury in a figurative sense by not testifying." (*Id.* at p. 1527.) Here, the most reasonable interpretation was that the evidence showed that Salgado fled after Marco's conviction, a fact that Salgado personally acknowledged multiple times on the recording. This is a fair comment on the state of the evidence, not misconduct.

G.    *Misleading the Jury*

1.    **Background**

Appellants contend the prosecutor committed misconduct by arguing that defense counsel would have pointed out any errors in the transcript if they existed, despite knowing that counsel's efforts to do so had been hampered. Specifically, they again challenge the argument that defense counsel "is a skilled attorney. So if there are errors in the transcript, they would have been presented." They also challenge a similar statement made around the same time: "Look, you have two very skilled attorneys over there, that if they felt that, hey, there were errors in the transcript, they would have presented that. They would have done more than just let, you know, an error go by."

2.    **Analysis**

Appellants assert the prosecutor erred by telling the jury to trust the accuracy of the transcripts despite knowing that "the defense asked for funding to do just that and the court did not approve it," and "asked for a continuance so that they could have the transcript reviewed and that was denied." This is not an accurate characterization of the record. As we observed in footnote 8 above, appellants assert the trial court denied their motions for independent translators to transcribe the wiretap recordings. The court stated on the record, however, that defense counsel had in fact requested transcriptions of the recordings, not independent translators, and "the court . . . held off on signing those orders, because the People had said they would be providing that." The court later added that both defense counsel had agreed they received the transcriptions. Neither counsel disputed the court's recollection. Likewise, neither appellant provides citations to the actual motions in the appellate record.

Courts have characterized as "obvious misconduct" prosecutorial arguments pointing out deficiencies in the defense case that are attributable to trial court rulings elicited by the prosecution. (See *People v. Castain* (1981) 122 Cal.App.3d 138, 146.) That did not happen here. The prosecutor did nothing to prevent the defense from hiring independent translators, and the record indicates defense counsel made no such request. The prosecutor did not commit misconduct by arguing that defense counsel could have identified errors in the transcripts.

### H. *Eroding the Integrity of the Trial*

#### 1. Background

During his opening statement, the prosecutor presented a slideshow. On one slide, which depicted a photograph of a pickup truck at a gas station, the prosecutor superimposed a photograph of Salgado's face on the truck, along with a clip-art gun and, in Salgado's words, "a comic-like 'pow' clip-art . . . where gunshots purportedly landed." In another slide, a photo of Garcia's head was superimposed onto a photo of a man standing outside a donut shop.

During his closing, the prosecutor predicted various arguments the defense might make during their closings. For example, he predicted they would argue that Miguel was not credible. During rebuttal, he stated: "Remember yesterday when I said these are some of the things that they may talk about? Remember that? Okay. I think I did pretty good. So one is reasonable doubt, right, that was talked about, right? That was talked about at length. And then the one that I thought was dicey was officers are lying. Like, oh, I thought I was going to be wrong on that one, but he had to get a little dig in on the detective, just a little one, but he went at it about what he did

and what he didn't do.  Remember?  And then, of course, witnesses are lying or mistaken, or there was a misunderstanding.  That's pretty good.  I hit all four, right?"

Three times during rebuttal, the prosecutor made what appellants characterize as jokes.  One such statement was the previously discussed remark about his "bad tie."  Another time, when discussing the justice system, he stated, "There are very few things that are perfect. I think my mom is perfect.  Other people might be, like, she screams a lot and she drives real slow.  But I think she's perfect."  The third time he made a traditional joke: "What is the difference between a lawyer and an accountant?  Accountants know they're boring – that's the difference – and lawyers don't.  We all think we're very interesting.  So because of that we're going to keep moving.  And I need you all to stay with me."

While discussing the Miguel-Salgado conversation, the prosecutor used variations on the word "fuck" twice.  He said, "He fucking admitted what happened.  We've been through this. [¶] His brother went to jail, they're talking about [*sic*].  We both did it.  [¶] I fucking messed up. I – oh, sorry, I added the f-word. I was in the groove." and "fuckin.'"

### 2.    Analysis

Appellants contend the prosecutor "demeaned the integrity" of the criminal justice system by making the remarks and displaying the slides described immediately above.  Though they focus on a subset of statements and two visual aids, they assert the "entire closing distracted the jury from the real issue in this case: whether the government proved appellant[s'] guilt beyond a reasonable doubt."  We disagree.

63

"Competent attorneys, including competent criminal defense attorneys, have varied styles in front of juries. Some are hard-charging, others soft-spoken; some try to gain the jurors' confidence by humor or other means . . . ." (*People v. Riel* (2000) 22 Cal.4th 1153, 1177.) The prosecutor in this case appears to belong in the last category. Appellants contend the prosecutor's behavior crossed the line into the juvenile and improper, a line they assert is strict for prosecutors because of their "unique function . . . in representing the interests, and in exercising the sovereign power, of the State." (*People v. Espinoza* (1992) 3 Cal.4th 806, 820 (*Espinoza*).) They cite *Hill, supra*, 17 Cal.4th at p. 834, in which the Supreme Court concluded that "juvenile courtroom behavior by a public prosecutor demeans the office, distracts the jury, prejudices the defense, and demands censure."

The prosecutor's conduct in this case is a far cry from that of the prosecutor in *Hill*, who audibly laughed during defense counsel's examination of the victim and another witness, made faces at him, and made a scene during his cross-examination of an expert. (See *Hill, supra*, 17 Cal.4th at p. 834.) The prosecutor's analogy between his mother and the judicial system may have been unusual and inartful, but there is nothing inherently outrageous or integrity-eroding about it. The same is true of the single self-deprecating joke near the end of a long argument and the prosecutor's comment about his own tie, which he made after Salgado's counsel remarked in closing that "he dresses sharp."

The same is true even when the cited incidents are considered collectively. The slides used at opening statement, which this court has examined, are not "inflammatory" or "inappropriately juvenile." While not exemplars of high-level

64

graphic design, they effectively conveyed in wordless images what the prosecutor stated the evidence would show. The shooting occurred at a gas station, and the Miguel-Garcia conversation was recorded at a donut shop. The prosecutor was permitted to present the information "in a story-like manner that holds the attention of lay jurors and ties the facts and governing law together in an understandable way." (*People v. Millwee* (1998) 18 Cal.4th 96, 137.) Appellants also claim the clip-art bubbles could not accurately depict where the bullets landed, because there was no forensic evidence. However, Victim testified about where he was standing when he was initially shot, where the bullets struck his body, and where he ran.

We do not endorse the use of profanity in the courtroom. The prosecutor's apparently inadvertent use of profane language during rebuttal was an occasional lapse from a generally decorous demeanor. (See *Espinoza*, *supra*, at p. 820.) We disagree with appellants' assertion that it "is in the same category of misconduct as laughing inappropriately during trial, rolling one's eyes or otherwise displaying an unprofessional demeanor"; the prosecutor did not curse at or in response to anyone. He also immediately apologized for the error.

Appellants do not cite any authority in support of their assertion that the prosecutor's "editorializing of defense counsel's arguments and self-congratulatory statements about his ability to accurately predict them were also inappropriate." In *People v. Redd*, *supra*, 48 Cal.4th at p. 736, the prosecutor characterized defense counsel's questioning of a witness as "patronizing." The Supreme Court found this comment was "well within the latitude allowed for comment upon deficiencies in opposing counsel's tactics." The court added that, "in context, the prosecutor's

comments were intended to persuade the jury to reject any implication that [the witness's] testimony should be discounted . . . and there is no reasonable likelihood that the jurors would view the remark as a personal attack on counsel." (*Ibid.*) The same is true here: the implication of the prosecutor's predictions was that he had contemplated the weaknesses in his case and surmounted them, and his remarks about the accuracy of his predictions were proper comments on deficiencies in defense counsel's theories and tactics.

## I. *Prejudice and Ineffective Assistance*

We concluded above that none of the isolated instances of prosecutorial misconduct was prejudicial. That conclusion does not change when we consider the errors collectively. The scattered instances of intemperate conduct were not so egregious as to infect the trial with such a degree of unfairness that the resultant convictions violated appellants' due process rights. (*People v. Panah,* supra, 35 Cal.4th at p. 462.) "Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127.)

Appellants argue that standard was met, because misconduct "eroded every possible chance [they] had at defending against this case by unlawfully shoring up problems with the prosecution's case." As they acknowledge, however, the wiretap evidence in this case was "compelling." Moreover, we presume the jurors followed the court's instructions to render a verdict based on the evidence, not the prosecutor's statements or their own personal feelings. On the record before this court, there is no reasonable probability that misconduct affected the outcome of the trial.

66

Appellants further assert that the prosecutor's "persistent erosion of our holy constitutional principles cannot continue to pass without rebuke," and refer us to several other cases in which this prosecutor was found to have committed misconduct. Pointing to *Hill*, *supra*, 17 Cal.4th at pp. 847-848, they suggest we should reverse the convictions in this case to deter the prosecutor from committing further misconduct. We decline to do so. In *Hill*, the court reversed the convictions based on "profoundly troubling" trial errors, including a significant amount of egregious prosecutorial misconduct. (*Hill*, *supra*, 17 Cal.4th at p. 847.) It then stated in dicta that the reversal "address[es] an institutional concern as well," namely repeated instances of prejudicial misconduct by the prosecutor. (*Id.* at p. 848.) *Hill* does not support the proposition that "reversal is appropriate if, for no other reason, to address the 'institutional concern'" of repeated misconduct by a single prosecutor.

Because we conclude that the limited instances of misconduct were not prejudicial, we reject appellants' contentions that their trial counsel provided ineffective assistance by failing to object.

## VI. Cumulative Error

Appellants contend that cumulative error and cumulative prejudice require reversal. We reject this contention.

"[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*Hill*, *supra*, 17 Cal.4th at p. 844.) "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.'

[Citation.] When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required." (*People v. Williams*, *supra*, 170 Cal.App.4th at p. 646.) As discussed above, in connection with issues raised by both appellants, and below, in connection with issues appellants raise individually, "[w]e have either found no error or, in those instances where error has been . . . [found or] assumed, no prejudice." (*People v. Williams* (2015) 61 Cal.4th 1244, 1291.) The few errors that occurred during appellants' trial were harmless, whether considered individually or collectively. Appellants were entitled to a fair trial, not a perfect one. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

**VII. Section 654**

In their opening briefs, appellants contend the trial court violated section 654's prohibition on multiple punishment by imposing concurrent sentences on all counts rather than sentencing them on the conspiracy count and imposing and staying sentences on the remaining counts (attempted murder for Garcia, and attempted murder and felon in possession for Salgado). Respondent agrees in its response brief that the sentences for attempted murder should have been stayed, but does not address Salgado's argument about his sentence for illegal possession of a firearm.

While the appeal was pending, the Legislature amended section 654 to give the court discretion to impose sentence on any count, not merely the one with the longest sentence, and stay any remaining sentences to which the section applied. (See Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1; compare § 654, subd. (a) with former § 654, subd. (a).) Appellants filed supplemental briefs arguing that the amendments to section 654 apply to them,

68

and asserting that remand is necessary so the trial court may sentence them in accordance with its new discretion. Respondent concedes that the amendment applies to appellants, but argues that remand is appropriate only as to Garcia. As to Salgado, respondent asserts, the trial court "clearly indicated that it would not have exercised its discretion to stay appellant's sentence in count 2." Respondent also argues for the first time in this supplemental brief that Salgado's conviction for illegal firearm possession is not subject to section 654.

We consider these arguments on the merits, notwithstanding appellants' failure to assert them below. (See *People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.) We affirm the trial court's finding that Salgado's conviction for firearm possession is not subject to section 654. However, we reverse both appellants' sentences and remand for resentencing under section 654 as amended.

### A.   *Background*

The trial court sentenced Garcia to 25 years to life on the conspiracy count, the count which carried the longest term. It imposed a concurrent life term on the attempted premeditated murder count.

The trial court also sentenced Salgado to 25 years to life on the conspiracy count, but doubled the 25 years to 50 years due to Salgado's prior strike. It additionally imposed a consecutive term of 10 years due to the firearm allegation, for a total sentence of 60 years to life on count two. The court imposed a concurrent life term on the attempted murder count and stayed a 10 year term for the firearm enhancement. The court struck Salgado's strike for purposes of the attempted murder count and the firearm

69

possession count, on which the court imposed the high term of three years, to run concurrent to the sentence for conspiracy.

The court found that section 654 did not apply to the conspiracy and attempted murder counts because "both could be completed without completing the other one."  It also found that section 654 did not apply to Salgado's firearm possession conviction count, though it gave no explanation.  While sentencing Salgado, the court commented that it thought Salgado was "a changed man now, and in some ways this pains me to sentence him."

## B.    *Analysis*

Section 654 "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642.)  Whether an offense is an indivisible course of conduct is a question of fact.  We uphold the trial court's resolution of that question when it is supported by substantial evidence.  (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

At the time appellants were sentenced, and the opening briefs in this matter were filed, section 654 provided, in relevant part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).)  Thus, the court correctly sentenced appellants first on the conspiracy count, which carried a mandatory term of 25 years to life (§§ 182, subd. (a), 190, subd. (a)), rather than on the attempted premeditated

70

murder count, which carried a sentence of life (§ 664, subd. (a)). However, we agree with the parties that the court erred in imposing a concurrent sentence on the attempted murder count. "It is of course true that Penal Code section 654 prohibits the imposition of sentences, whether concurrent or consecutive, for both a murder and a conspiracy to commit the murder." (*People v. Moringlane* (1982) 127 Cal.App.3d 811, 819.) Substantial evidence does not support the court's finding that the conspiracy to commit murder and the attempted murder of Victim were not subject to section 654. The parties all agree that Victim's murder was the object of the conspiracy. The court accordingly could not impose double punishment for those crimes.

Salgado contends that his possession of the firearm was also part of the same criminal objective. In particular, he points to his remarks to Miguel stating that he was given money and used it to buy guns. He argues that this demonstrates that his intent in possessing the weapon "was part and parcel with the objective of the two other crimes." He cites *People v. Kane* (1985) 165 Cal.App.3d 480, 488, in which the defendant was punished for both possessing a firearm and using the firearm in an assault. The People conceded, and the appellate court agreed, that the defendant "possessed the firearm, fired it at [the victim] and hit the [victim's car] in an indivisible course of conduct." (*People v. Kane, supra*, 165 Cal.App.3d at p. 488.)

Here, the court concluded otherwise, and that conclusion is supported by substantial evidence. Miguel testified that he saw Salgado with a gun prior to the day of the shooting, "and that day when he took it out." As Salgado points out, the evidence also showed that he used money to purchase guns, plural—but Miguel testified about seeing a single gun on the day of the crime. The

71

trial court reasonably could infer that Salgado possessed the other gun or guns for other purposes. Moreover, Miguel testified that he and Salgado dropped off the gun after Salgado shot Victim; by that point, the conspiracy and the attempted murder were completed, yet Salgado continued to possess the weapon. (See *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1413 [section 654 does not prohibit separate punishment for felon in possession where defendant was arrested with a gun 30 minutes after committing an armed robbery]; cf. *People v. Jones* (2002) 103 Cal.App.4th 1139, 1145 ["section 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm"].) The trial court did not err in declining to apply section 654 to the firearm possession count.

Had section 654 not been amended, we would simply modify appellants' sentences to reflect that the terms for attempted murder were stayed. However, Assembly Bill No. 518 amended section 654, subdivision (a), to provide: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The statute "now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) Because Assembly Bill No. 518 may result in a shorter term of imprisonment, it applies retroactively to appellants' nonfinal convictions. (See *ibid.*) We therefore remand for the court to resentence appellants under amended section 654. On

72

remand, the court may exercise its discretion to use the shorter term for attempted murder as the base term, if it so chooses.

We reject respondent's contention that remand is unnecessary as to Salgado. When the scope of a court's sentencing discretion is expanded, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) Respondent asserts that the record clearly indicates that the court would sentence Salgado the same way because it declined to strike his prior strike conviction for purposes of the conspiracy count. Respondent ignores that the court struck the strike for purposes of both the attempted murder and firearm possession counts. It further ignores the court's remarks that it viewed Salgado as a "changed man" and was "in some ways . . . pain[ed]" to sentence him. Such remarks indicate that the court may well choose to sentence Salgado differently in light of its new discretion. The court also may decline to sentence Salgado differently, but we cannot say with confidence that it would choose to impose the same sentence. (See *People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1391.)

Both appellants' sentences are vacated. On remand, both appellants are entitled to full resentencing. (*People v. Walker* (2021) 67 Cal.App.5th 198, 204.)

***Argument Raised by Garcia Only***

## I.    Instructions on Withdrawal

Part of Garcia's defense was that he withdrew from the conspiracy prior to the performance of any overt acts. The court accordingly instructed the jury with CALCRIM No. 420

73

(Withdrawal From Conspiracy). Garcia now contends this instruction was erroneous in three respects: it "(1) required appellant to take affirmative steps to withdraw from the conspiracy prior to an overt act being performed in furtherance of the conspiracy; (2) imposed a subjective standard for withdrawal; and (3) required appellant to communicate his withdrawal to all known conspirators rather than simply renounce conspiracy [*sic*] in a substantial way." The court also instructed the jury with CALCRIM No. 401 (Aiding and Abetting: Intended Crimes). Garcia contends this instruction also erroneously stated withdrawal could be effectuated only if he notified everyone he knew was involved in the crime that he was no longer participating. We find no error in either instruction.

## A. *Background*

Detective Lugo testified that Garcia stated during his interrogation that Garcia told unnamed individuals at his workplace "not to do it" on the morning of the shooting. Garcia's trial counsel reminded the jury of this testimony during closing.

The court instructed the jury with CALCRIM No. 420, which as given provided:

"The defendant is not guilty of conspiracy to commit murder if he withdrew from the alleged conspiracy before any overt act was committed. To withdraw from a conspiracy, the defendant must truly and affirmatively reject the conspiracy and communicate that rejection, by word or deed, to the other members of the conspiracy known to the defendant.

"A failure to act is not sufficient alone to withdraw from a conspiracy.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw from the

74

conspiracy before an overt act was committed.  If the People have not met this burden, you must find the defendant not guilty of conspiracy.  If the People have not met this burden, you must also find the defendant not guilty of the additional acts committed after he withdrew."

The sole overt act alleged in the information and on which the jury was instructed was, "On or about September 10, 1996, Miguel Contreras and Antonio Salgado drove around Compton looking for [Victim] to kill him."

The court also instructed the jury on aiding and abetting liability using CALCRIM No. 400 (Aiding and Abetting: General Principles) and CALCRIM No. 401 (Aiding and Abetting: Intended Crimes).  The latter instruction provided, in relevant part:

"A person who aids and abets a crime is not guilty of that crime if he withdraws before the crime is committed. To withdraw, a person must do two things:

"1.      He must notify everyone else he knows is involved in the commission of the crime that he is no longer participating.  The notification must be made early enough to prevent the commission of the crime.

"AND

"2.      He must do everything reasonably in his power to prevent the crime from being committed.  He does not have to actually prevent the crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw.  If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory."

75

**B.    *Analysis***

Garcia's trial counsel did not object to these instructions below.  Accordingly, any claims of state law error are forfeited.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).)  However, failure to object to instructional error does not effect a forfeiture if a defendant's substantial rights are affected.  (*Ibid.*, citing § 1259.)  Garcia asserts that the flawed instructions deprived him of due process and his right to a jury determination of all the facts pertaining to his guilt or innocence.  If true, Garcia's substantial rights would be affected.  We accordingly consider the merits of his claims.

We review claims of instructional error de novo.  (*People v. Mitchell, supra*, 7 Cal.5th at p. 579.)  In doing so, we review the wording of the instruction at issue and determine whether it accurately states the law.  (*Ibid.*)  We also "must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution."  (*Ibid.*)  We make this assessment in light of the entirety of the trial record and the jury instructions as a whole.  (*Ibid.*)

### 1.    CALCRIM No. 420: "Truly"

Garcia's primary point of contention with CALCRIM No. 420 is its requirement that a defendant "truly and affirmatively reject the conspiracy."  He argues that the jury most likely understood the word "truly" in a subjective sense, and that is improper because the authorities cited in the bench notes for CALCRIM No. 420 do not support application of a subjective standard for withdrawal from a conspiracy.

The primary authority for the instruction is *People v. Crosby* (1962) 58 Cal.2d 713 (*Crosby*).[13]  In *Crosby*, numerous defendants were charged by indictment with "criminal conspiracy to commit crimes, to cheat and defraud by criminal means, and to obtain money by false promises with fraudulent intent not to perform such promises."  *Crosby, supra*, 58 Cal.2d at p. 717.)  A subset moved to dismiss the indictment under section 995, and the trial court granted some of the motions as to the conspiracy count.  The People appealed.  (*Id.* at p. 718.)  As relevant here, four defendants contended the conspiracy count was properly dismissed because they withdrew from the conspiracy at an early stage.  (*Id.* at p. 730.)  The Supreme Court rejected this argument because "[i]t is not part of the People's prima facie case to negate the possibility of such withdrawal," and "[o]nce the defendant's participation in the conspiracy is shown, it will be presumed to continue until he is able to prove as a matter of defense that he effectively withdrew from the conspiracy before the relevant limitations period began to run."  (*Id.* at pp. 730-731.)  The Court additionally explained that such withdrawal required more than "mere failure to continue previously active participation in a conspiracy."  (*Id.* at p. 730.)  "[T]here must be *an affirmative and bona fide* rejection or repudiation of the conspiracy, communicated to the co-conspirators."  (*Ibid.*, emphasis added.)

_____

[13] As Garcia acknowledges, the other two cases cited in the bench notes rely on *Crosby* for the proposition that withdrawal from a conspiracy requires "an affirmative and bona fide rejection or repudiation of the conspiracy, communicated to the co-conspirators."  (*People v. Sconce* (1991) 228 Cal.App.3d 693, 701; *People v. Beaumaster* (1971) 17 Cal.App.3d 996, 1003.)  Because this is the language with which Garcia takes issue, we examine only *Crosby* in detail.

Garcia asserts that the phrase "affirmative and bona fide" is "ambiguous," and suggests it does not map to or support the use of the phrase "truly and affirmatively" in CALCRIM No. 420. We disagree. Obviously, affirmative and affirmatively are variants of the same word; Garcia makes no argument regarding "affirmatively." "Bona fide," the Latin for "in good faith," is defined as "1. Made in good faith; without fraud or deceit. 2. Sincere; genuine." (Black's Law Dictionary (11th ed. 2019) p. ___.) The dictionary definition of "truly" Garcia provides includes both "in all sincerity: SINCERELY" and "without feigning, falsity, or inaccuracy in truth of fact." (Merriam-Webster Dictionary < https://www.merriam-webster.com/dictionary/truly> [as of May 9, 2022]archived at <KBD4-M9XA>.) Garcia asserts the jury "most likely" understood the term "truly" in the latter sense. Even if this speculative assertion is accurate, such understanding tracks the first definition of "bona fide." *Crosby* accordingly supports the more modern turn of phrase used in CALCRIM No. 420.

Garcia contends "truly" has subjective connotations, however, while "the standard for withdrawal from a conspiracy should be objective." He argues that liability for conspiracy is based on objective conduct, and therefore the elimination of liability via withdrawal should rest upon the same standard. Garcia is mistaken on both counts. As the court instructed the jury using CALCRIM No. 252 (Union of Act and Intent: General and Specific Intent Together), conspiracy is a specific intent crime. (*People v. Swain* (1996) 12 Cal.4th 593, 600.) "'To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of that

offense.' [Citation.]" (*Ibid.*, emphasis omitted.) That is, as stated in CALCRIM No. 252, the defendant "must not only intentionally commit the prohibited act, but must do with a specific intent and/or mental state." The same is true for withdrawal: a defendant must not only reject the conspiracy and communicate that rejection to known coconspirators, he or she must do so with the requisite intent, as indicated with "truly." CALCRIM No. 420 accurately conveys this legal concept to the jury. There is no reasonable likelihood the instruction caused the jury to misapply the law, particularly in light of unchallenged instruction CALCRIM No. 252.

### 2. CALCRIM No. 420: Notice Requirement

Garcia also takes issue with CALCRIM No. 420's requirement that a defendant communicate his or her rejection of the conspiracy, by word or deed, "to the other members of the conspiracy known to the defendant." He contends "withdrawal from a conspiracy should not require the defendant to notify all known conspirators of his withdrawal, but only communicate the withdrawal to enough conspirators to constitute a substantial disavowal of the conspiracy."

*Crosby*, *supra*, 58 Cal.2d at p. 730 specifically states that a defendant's withdrawal "must be . . . communicated to the coconspirators." Garcia contends this language was not supported by the authority the *Crosby* court cited, and therefore should not be a requirement. Regardless of *Crosby*'s provenance, decisions of the Supreme Court "are binding upon and must be followed by all the state courts of California." (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.) A discrepancy in citations is not a basis for this court to adopt Garcia's proposed "substantial disavowal" standard.

79

Garcia further asserts that *Crosby* "did not expressly require the withdrawing conspirator to communicate the withdrawal to all known conspirators."  Indeed, it arguably required communication to *all* coconspirators (whether known or not), due to its lack of any modifier or qualifier on "the coconspirators."  However, CALCRIM No. 420 expressly limits the scope of a defendant's obligation to notify to those individuals he or she knows.  We see no error in this limitation.  Moreover, it is potentially advantageous to the defendant, as a conspiracy may involve members unknown to him or her.  (See *People v. Ray* (1967) 251 Cal.App.2d 459, 463.) Garcia suggests this language may have worked against him in this case, as the jury may have rejected his defense because it heard evidence that his cousin, Javier Hernandez, was the person who wanted Victim killed, but did not hear any evidence that Garcia communicated to him a desire to withdraw from the conspiracy.  This is speculative; the prosecutor did not mention Hernandez in closing. He argued only that it would be "unreasonable" for the jury to conclude that Garcia withdrew from the conspiracy immediately before Miguel and Salgado left work to do the shooting.  There is no reasonable likelihood the notice requirement in CALCRIM No. 420 caused the jury to misapply the law.

### 3.      CALCRIM No. 401: Notice Requirement

Garcia raises a similar challenge to CALCRIM No. 401's requirement that an aider and abettor "notify everyone else he knows is involved in the commission of the crime that he is no longer participating."  He contends the two appellate court cases listed in the bench notes, and the citations they contain, do not support the proposition that notice to all known participants is required.  In his view, the "better standard is [the] substantial

withdrawal standard" he also argued should apply to conspiracy. Respondent asserts this argument is foreclosed by *Fayed*, *supra*, 9 Cal.5th at pp. 178-179.  We agree the argument is foreclosed; the Supreme Court held in *People v. Richardson* (2008) 43 Cal.4th 959 (*Richardson*) and reiterated in *Fayed* that substantially similar instruction CALJIC No. 3.03 is a correct statement of the law.

CALJIC No. 3.03 (Termination of Liability of Aider and Abettor) is a still-extant predecessor instruction to CALCRIM No. 401. Substantially similar to the portion of CALCRIM No. 401 regarding withdrawal, it provides:

"Before the commission of the crime[s] charged in Count[s] _____, an aider and abettor may withdraw from participation in [that] [those] crime[s], and thus avoid responsibility for [that] [those] crime[s] by doing two things: First, [he] [she] must notify the other principals known to [him] [her] of [his] [her] intention to withdraw from the commission of [that] [those] crime[s] second, [he] [she] must do everything in [his] [her] power to prevent its commission

"The People have the burden of proving that the defendant was a principal in and had not effectively withdrawn from participation in [that] [those] crime[s]. If you have a reasonable doubt that [he] [she] was a principal in and participated as an aider and abettor in a crime charged, you must find [him] [her] not guilty of that crime[.] [, and any crime committed by a co-principal that was a natural and probable consequence of the same crime.]"  (CALJIC No. 3.03.)

In *Richardson, supra*, 43 Cal.4th at p. 1022, the Supreme Court considered and rejected the argument that CALJIC No. 3.03 "'imposes an unreasonable burden on the person desiring to

81

withdraw from the criminal activity.'" The court held, simply, "The instruction is a correct statement of the law." (*Ibid.*) Notably, it cited *People v. Norton* (1958) 161 Cal.App.2d 399, 403, the very case identified in the bench notes to CALCRIM No. 401 that Garcia contends is unsupported by authority. The Supreme Court reiterated this holding recently in *Fayed*, *supra*, 9 Cal.5th at p. 178: "Even assuming that defendant did not forfeit the claim that CALJIC No. 3.03 misstates the law, his claim lacks merit. In 2008, three years after the Judicial Council's adoption and endorsement of CALCRIM, this court explained that CALJIC No. 3.03 'is a correct statement of the law.'"

As stated previously, this court is bound by the rulings of our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County*, *supra*, 57 Cal.2d at p. 455.) We accordingly reject Garcia's contention that CALCRIM No. 401 misstates the law on withdrawal by aiders and abettors.

***Arguments Raised by Salgado Only***

## I.  Admission of Garcia's Interrogation

Salgado contends the trial court erred in admitting the redacted recording and transcript of Garcia's interrogation. He argues the statement impermissibly implicated him despite the redactions, thereby violating his constitutional right of confrontation. Salgado further contends, both in his appellate brief and in his habeas petition, that his trial counsel was ineffective in failing to renew a preliminary objection to the admission of the interrogation on these grounds. We agree with respondent that the issue is forfeited. Even if it were not, we find no error on the merits. We accordingly reject Salgado's appellate claim that he received ineffective assistance of counsel.

## A. *Background*

Prior to opening statements, the prosecutor told the court he did not plan to introduce the statements Garcia made during his interrogation. The court asked the prosecutor to apprise the court if he changed his mind, then asked Salgado's counsel for his thoughts. Salgado's counsel said he wanted to "put on the record that to the extent if it is somehow introduced, to the extent that it implicates my client, in violation of *Aranda/Bruton*, I'd be asking for the prosecutor to sanitize that statement and then have a 402 just to make sure there is no implication toward my client." The prosecutor responded that he "already gave them a transcript, completely sanitized, avoiding any *Aranda/Bruton*." Salgado's counsel confirmed, "I did receive that." The court suggested counsel review the transcript, and reminded him that "if the People are going to put it in, it's not coming in against your client." The parties never revisited the issue.

The prosecutor played excerpts of Garcia's interrogation while Detective Lugo was on the stand. He provided the jury with translated transcripts, which included black-box redactions of varying lengths. The court previously had instructed the jury to "disregard" and "not consider for any purpose" redactions in the translated transcripts of the Miguel-Garcia conversations.

While Detective Lugo was testifying about the interrogation, Salgado's counsel objected once on hearsay grounds after Lugo already had answered the question at issue. He also objected that certain questions were leading, and "leading and compound [ ] and hearsay." The court overruled the objections. Counsel did not object to the recording or the transcript specifically. When the prosecution moved to admit all the evidence at the close of its case in chief, Salgado's counsel made a

83

"general objection" on the grounds of foundation and relevance. The court admitted all the evidence.

After the defense rested, the court instructed the jury to consider Salgado's out-of-court statements against Salgado only, and to consider Garcia's out-of-court statements against Garcia only. (CALCRIM No. 305.)

### B. *Analysis*

"Under the so-called *Aranda/Bruton* doctrine, a trial court may generally not allow a jury in a joint criminal trial of a defendant and codefendant to hear the unredacted confession of the codefendant that also directly implicates the defendant—even if the jury is instructed not to consider the confession as evidence against the defendant." (*People v. Washington* (2017) 15 Cal.App.5th 19, 22 (*Washington*), citing *People v. Aranda* (1965) 63 Cal.2d 518, 529-531 (*Aranda*), abrogated in part by Cal. Const., art. I, § 28, subd. (d); *Bruton v. United States* (1968) 391 U.S. 123, 128-136 (*Bruton*).) Because confessions are viewed as particularly incriminating, they are treated as an exception to the general rule that the jury follows all instructions; the jury is not expected to heed the court's instruction to ignore the confession as to the other defendant. "Thus, unless the codefendant testifies and is subject to cross-examination, the admission of the codefendant's unredacted confession at the joint trial violates the defendant's Sixth Amendment right to confront and cross-examine witnesses." (*Washington, supra,* 15 Cal.App.5th at p. 19.)

*Aranda/Bruton* problems can be avoided "by redacting the codefendant's confession in such a way that both omits the defendant but does not prejudice the codefendant." (*Washington, supra,* 15 Cal.App.5th at p. 27.) "Redactions that simply replace

84

a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration" are inadequate. (*Gray v. Maryland* (1998) 523 U.S. 185, 192 (*Gray*); see also *People v. Fletcher* (1996) 13 Cal.4th 451, 456 (*Fletcher*) ["The editing will be deemed insufficient to avoid a confrontation violation if, despite the editing, reasonable jurors could not avoid drawing the inference that the defendant was the coparticipant designated in the confession by symbol or neutral pronoun."].) This is true even where the confession is facially neutral but other evidence at trial is such that a reasonable juror could not help but infer that the nonconfessing defendant was the missing person mentioned in the confession. (*Fletcher*, *supra*, 13 Cal.4th at p. 457.) The sufficiency of the editing "must be determined on a case-by-case basis in light of the statement as a whole and the other evidence presented at trial." (*Id.* at p. 468.)

Salgado argues that the redactions of Garcia's interrogation "did nothing to hide his identity," "especially considering the prosecutor's opening and closing remarks explicitly filled in the dots for jurors." This argument is forfeited due to trial counsel's failure to object below. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1044.) Even if it were not, however, it lacks merit.

The redactions in the interrogation transcript would not lead a reasonable juror to the sole inference that Salgado was their subject, particularly the excerpts Salgado highlights. Two-thirds of the first page of the longer transcript is redacted. A few lines in, after Garcia said where he worked in 1996, Lugo asked, "You [two redacted lines of text] and with Miguel Contreras." Salgado asserts "it was not a mystery that appellant's name was the one redacted." However, the jury heard evidence that Garcia's coworkers included several people in addition to

Salgado, including Valencia and "Munchy," and the redaction is far too lengthy to be concealing a single name. The same is true of the five redacted lines further down the page, after which Lugo said, "Him too, right?" Salgado complains that the prosecutor filled in the gaps for the jury, but the prosecutor's statements were not evidence.

Salgado has not demonstrated that his counsel's failure to object to these redactions fell below an objective level of reasonableness. (*Welch*, supra, 61 Cal.4th at p. 289.) Accordingly, his claim of ineffective assistance is denied.

## II. Failure to Dismiss Strike and Firearm Enhancement

Salgado contends the court erred in denying his *Romero*[14] motion to strike his prior strike conviction and the firearm enhancement imposed under section 12022.5. He argues that the court's decision "does not conform with the spirit of either of these laws." We find no abuse of discretion and affirm.

### A. *Background*

Salgado admitted the prior strike conviction alleged in the information: a June 14, 1996 robbery conviction (§ 211). After trial, he filed a *Romero* motion to strike the strike. He argued that the court should exercise its discretion to strike the strike for purposes of sentencing because he suffered the conviction more than 20 years ago and had not suffered any convictions since then. He further asserted that he had become a devoted family man, excelled in his occupation, and participated in many programs while in custody for this case. Salgado attached as exhibits letters from two of his children, his stepdaughter, and a family friend; a letter from someone whose internship he supervised; a letter confirming his pre-incarceration enrollment

---

[14] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

and progress in an adult education program; a transcript from an educational program he was pursuing in jail; an acceptance letter from the Delancey Street Foundation; and copies of his resume.

At the hearing on the motion, Salgado's trial counsel pointed the court to the exhibits and emphasized that Salgado had been a productive member of society and supported his family for many years. He characterized Salgado as "the poster child for the whole reasoning behind a *Romero* motion." Counsel also emphasized that the strike conviction occurred more than 20 years ago, in 1996, when Salgado was only 21 years old. He acknowledged that "the counter argument would be that in 1996, when [the instant] crime was committed, he had previously committed a robbery . . . that same year," but argued "*Romero* isn't just looking at that short period of time." Counsel further asserted that Salgado left Compton for Missouri "to get a better life," and not to "escape prosecution," because he used his own name and undertook no efforts to conceal his whereabouts.

The court responded, "I may disagree with much of what you said. But it seems to me that your client had a very large hand. If your client had not embarked on the incident for which we are here today, an innocent man would not have spent almost 20 years in prison." Salgado's counsel urged the court to "look[ ] at it from a perspective of my client committed a crime and then left; that was it. And then he changed his whole life around, to be a productive member of society."

The court told counsel it found his argument about Salgado's motivation for leaving the state "disingenuous," because the evidence at trial showed Salgado left after being confronted by Miguel's family. The court agreed with counsel, however, that Salgado "has proven to be a good father." The

87

court also noted that Salgado had been respectful in court, and remarked that "if he had been confronted with this option later in life, [he] would not have chosen that path." The court continued: "But the simple fact of the matter is that he did choose the path back in 1996 for which he is here. An innocent individual served a lot of time over this. [¶] And that strike, even though it's 23 years old from now, 23 and a half years, was three months old at the time this occurred. [¶] As such, the court is not going to be granting the *Romero* motion, and that is denied."

At sentencing, Salgado's counsel requested leniency. Specifically, he asked the court to stay the sentence for the attempted murder, "stay sentencing or dismiss, if possible, the 667(a) prior," and "dismiss the gun enhancement or stay the gun enhancement."

The court stated it was "taking into account that he has changed." It further stated, however, that the crime "was a callous attempt at taking another man's life, not for an aggravated reason" or due to provocation. "This was well thought out. And Mr. Salgado was a hired hitman. He may have failed, thankfully, in that. But he caused a great deal of damage not only to the victim and the victim's family, but to himself." The court also mentioned Marco's wrongful conviction, but stated, "the court does not even need to consider that as an aggravating factor."

The court applied the strike to Salgado's sentence on the conspiracy count, doubling it from 25 to 50 years to life, but it struck the strike as it applied to the attempted murder and firearm possession counts. The court also stayed the firearm enhancement on the attempted murder count, and chose to run Salgado's sentences concurrently.

**B.** *Analysis*

The trial court must decide whether to strike a prior strike conviction by considering only factors intrinsic to the Three Strikes sentencing scheme. (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).) It "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Ibid.*) The spirit and purpose of the Three Strikes law is to punish recidivists more harshly. (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1140 (*Avila*).) The law "establishes a sentencing norm" and "carefully circumscribes the trial court's power to depart" from that norm. (*Ibid.*, quoting *People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*).)

We review a trial court's denial of a *Romero* motion for abuse of discretion. (*Carmony*, *supra*, 33 Cal.4th at p. 374.) A trial court abuses its discretion where it considers impermissible factors, fails to consider proper ones, or makes a decision so irrational or arbitrary no reasonable person could agree with it. (*Id.* at pp. 377-378.) We review the court's refusal to strike a firearm enhancement under the same deferential standard. (See *People v. Pearson* (2019) 38 Cal.App.5th 112, 116.)

The trial court, which in fact struck the strike as to two of Salgado's offenses and stayed the firearm enhancement as to one of them, acted well within its discretion here. It considered the callous nature and circumstances of Salgado's present felonies, the violent and temporally proximate nature of his prior

conviction, and the particulars of his background, character, and prospects. Salgado asserts the court focused too extensively on the nature and circumstances of the current offenses, "to the exclusion of other important, relevant factors," but the record does not support that characterization.

Salgado contends his case is analogous to *Avila, supra,* 57 Cal.App.5th 1134. In *Avila,* the defendant's present felonies involved confronting fruit salespeople on the street, demanding money, and squashing their wares when he was not paid. (See *Avila, supra,* 57 Cal.App.5th at p. 1139.) Avila was convicted of one count of attempted robbery and one count of attempted extortion. (*Ibid.*) The trial court denied a *Romero* motion to strike the previous strikes Avila accrued nearly 30 years earlier, when he was 18 and 20, and sentenced him to 25 years to life plus 14 years. (*Ibid.*; see also *id.* at p. 1141.) The court of appeal found this was an abuse of discretion, because the trial court considered impermissible factors and failed to consider relevant ones. (*Id.* at p. 1141.) The court of appeal highlighted the age of the strike offenses, Avila's age when they were committed, and the trial court's mischaracterization of the current offenses as violent. (*Id.* at pp. 1141-1143.) It also noted that Avila had committed only non-violent and relatively minor offenses since that time, and struggled with longstanding drug addiction. (*Id.* at p. 1144.) It concluded that, "[f]or those reasons, no reasonable person could agree that the sentence imposed on Avila was just." (*Id.* at p. 1145.)

*Avila* is distinguishable. Salgado's present crimes involved far more serious and violent conduct than squashing fruit, a fact the trial court properly considered, and his past crime, robbery, was a violent felony. (See § 667.5, subd. (c)(9).) The court also

90

considered the remoteness of Salgado's prior conviction, and the role his youthful impulsivity likely played in both his past and current crimes. While asserting that the court failed to "focus on the entire picture," Salgado simultaneously points to positive remarks *the court made* about Salgado's respectful behavior, devoted parenthood, and steady employment. We are not persuaded that the court's careful balancing of all these factors, which resulted in striking the strike as two of the convictions, staying the firearm enhancement as to one of them, and imposing concurrent sentences, was unjust or an abuse of the court's discretion.

Salgado asserts that the court's remark that Salgado "would not have chosen that path today" "is, in essence, a factual finding that appellant would not recidivate. To then deem him within the spirit of a law that exists solely to punish persons who likely *will recidivate*, was therefore error." He also points out that he will not be eligible for parole until the age of 60, even if the strike is fully stricken, and that the firearm enhancement would do little more than increase his already de facto life sentence. These contentions are not persuasive. Even if the court's remarks were considered a factual finding regarding future recidivism, the fact remains that Salgado did nearly immediately recidivate when he committed the instant crimes. His incarceration through his elder years is in large part due to the significant delay in his apprehension for the crimes; it does not evince an abuse of the trial court's discretion regarding either the strike or the firearm enhancement.

### III. Constitutionality of Sentence and Eligibility for *Franklin* Hearing

The court sentenced Salgado, now in his 40s, to a total term of 60 years to life for crimes he committed when he was 21. Salgado asserts that this sentence amounts to a de facto life term, and, as a youth offender, he should be eligible for an early parole hearing under section 3051. He further asserts that the trial court erred in denying his request for a *Franklin*[15] hearing to present youth-related mitigating information to the trial court. Salgado contends that the denial of a youth offender parole hearing and *Franklin* hearing violates the equal protection clauses of the federal and state constitutions, and renders his sentence cruel and unusual. We disagree.

#### A. *Background*

Prior to the sentencing hearing, Salgado's counsel moved to continue sentencing in part due to "the *Franklin* issues." At sentencing, the court noted that counsel was looking for Salgado's high school records but denied the continuance in part because "[t]he *Franklin* hearing we can put on at any point in time." As discussed previously, the court denied Salgado's motion to strike his strike and sentenced him under the Three Strikes law.

Salgado subsequently filed a brief arguing that section 3051, subdivision (h) violates the equal protection clause by excluding youth offenders sentenced pursuant to the Three Strikes law from receiving a youth offender parole hearing. He relied on *People v. Edwards* (2019) 34 Cal.App.5th 183, 197 (*Edwards*), which held that section 3051, subdivision (h) violates the equal protection clause to the extent it bars sex-offending youths sentenced pursuant to the One Strike law from receiving

_____

[15] *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

youth offender parole hearings.[16]  Salgado did not make any argument regarding cruel and unusual punishment in that brief.

After a hearing, the court concluded Salgado was ineligible for a youth offender parole hearing because section 3051, subdivision (h) bars such hearings for youth sentenced under the Three Strikes law.  The court further found that Salgado accordingly was not entitled to a *Franklin* hearing.

### B.    *Analysis*

#### 1.    **Equal Protection**

We review equal protection claims de novo.  (*People v. Laird* (2018) 27 Cal.App.5th 458, 469.)  "The California equal protection clause offers substantially similar protection to the federal equal protection clause." (*Ibid.*)  To assert a successful claim under either, Salgado must show that the state classifies unequally two groups that are similarly situated for purposes of the challenged law.  (*Ibid.*)  "If the groups are similarly situated but treated differently, the state must provide a rational justification for the disparity." (*People v. Lynch* (2012) 209 Cal.App.4th 353, 358.)  If the law interferes with a fundamental constitutional right or involves a suspect classification, such as race or national origin, the state must provide a compelling rationale for the law.  (*Ibid.*)

_____

[16] The Supreme Court has granted review of the following issue: "Does Penal Code section 3051, subdivision (h), violate the equal protection clause of the Fourteenth Amendment by excluding young adults convicted and sentenced for serious sex crimes under the One Strike law (Pen. Code, § 667.61) from youth offender parole consideration, while young adults convicted of first degree murder are entitled to such consideration?"  (*People v. Williams*, No. S262229.)

Salgado was 21 years old when he committed the instant offenses. Pursuant to section 3051, subdivisions (a) and (b), offenders 25 years of age and younger at the time of their offense are eligible for a youth offender parole hearing after 15, 20, or 25 years in prison, depending on the sentence they received. However, section 3051, subdivision (h) states, "[t]his section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61, or to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age." Salgado argues he is similarly situated to youth offenders who were not sentenced pursuant to the Three Strikes Law, and further argues there is no rational basis for the differential treatment.

Our colleagues in the First District rejected an identical argument in *People v. Wilkes* (2020) 46 Cal.App.5th 1159 (*Wilkes*). We find the reasoning of *Wilkes* persuasive and adopt it here. "The purpose of section 3051 is 'to give youthful offenders "a meaningful opportunity to obtain release" after they have served at least 15, 20, or 25 years in prison (§ 3051, subd. (e)) and made "a showing of rehabilitation and maturity"' and 'to account for neuroscience research that the human brain—especially those portions responsible for judgment and decisionmaking—continues to develop into a person's mid-20s.' [Citation.] Assuming a Three Strikes youth offender is similarly situated to other youth offenders for purposes of section 3051, the Legislature could rationally determine that the former—'a recidivist who has engaged in significant antisocial behavior and who has not benefited from the intervention of the criminal

94

justice system' [citation]—presents too great a risk of recidivism to allow the possibility of early parole." (*Wilkes*, *supra*, 46 Cal.App.5th at p. 1166.)

Salgado again relies on *Edwards*, *supra*, 34 Cal.App.5th 183. *Wilkes* concluded *Edwards* was distinguishable. (*Wilkes*, *supra*, 46 Cal.App.5th at p. 1166.) We agree. "'The "One Strike" law is an alternative, harsher sentencing scheme that applies to specified felony sex offenses,' such that "'a first-time offense can result in one of two heightened sentences.'" [Citation.] The distinguishing characteristic of Three Strikes offenders, of course, is that they are not being sentenced for a first-time offense. Thus, the ample authority rejecting equal protection challenges from Three Strikes offenders did not apply in *Edwards*. Indeed, *Edwards* itself took pains to 'note that criminal history plays no role in defining a One Strike crime,' and that '[t]he problem in this case is' the categorical exclusion of 'an entire class of youthful offenders convicted of a crime short of homicide. . ., *regardless of criminal history*. . . .' (*Edwards*, at p. 199 [ ], italics added.)" (*Wilkes*, *supra*, 46 Cal.App.5th at pp. 1166-1167.)

Salgado also points to a concurring statement Justice Liu made in connection with the denial of a petition for review. (*People v. Montelongo*, Liu, J., concurring in denial of petition for review, Jan. 27, 2021, S265597.) In that statement, Justice Liu opined that section 3051's exclusion of youth offenders sentenced to life without parole "stands in 'tension' with *Miller v. Alabama* (2012) 567 U.S. 460" because *Miller* emphasized that none of the factors that make youth less culpable than adults are crime-specific. Justice Liu also stated "there is a colorable claim that section 3051's exclusion of certain juvenile offenders based on their controlling offenses 'violates principles of equal protection

95

and the Eighth Amendment.'" To the extent this statement constitutes persuasive authority, it does not address youth offenders subject to the Three Strikes law, who are excluded not based on their controlling offenses but rather their recidivism.

## 2. Cruel and Unusual Punishment

Relying solely on Justice Liu's statement, Salgado also asserts for the first time on appeal that "[a]ppellant's exclusion from youth offender parole renders his sentence cruel and unusual" in violation of the state and federal constitutions. Respondent contends this argument is forfeited because it was not raised below. (See *People v. Burgener* (2003) 29 Cal.4th 833, 886.) In reply, Salgado asserts that the issue is reviewable "because it is a facial challenge to the law, not one specific to appellant." We disagree. Salgado specifically challenges "[a]ppellant's exclusion" and claims section 3051, subdivision (h) "renders his sentence cruel and unusual." This is an as-applied challenge, not a facial one. It is forfeited, and we decline to address it.

## DISPOSITION

Appellants' sentences are vacated and the matter is remanded for resentencing under amended Penal Code section 654. The judgments of conviction are otherwise affirmed in all respects. Appellant Salgado's habeas petition is denied by separate order.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

WILLHITE, ACTING P.J.                    CURREY, J.

96